UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ISAIAH BROWN,                  :
                              :
                              :        PRO SE
          Petitioner,         :
                              :    04 Civ. 3607 (KMK) (THK)
                              :    _____
     -against-                :    **REPORT AND RECOMMENDATION**
                              :
RAYMOND J. CUNNINGHAM,         :
                              :
          Respondent.         :
                              :
------------------------------X

**TO: HON. KENNETH M. KARAS, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

This habeas corpus proceeding was referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and Rule 72.1(d) of the Local Civil Rules of the Southern District of New York. The Petition raises claims with respect to two separate trials, the first of which involved assault-based charges ("Trial I"), and the second of which involved drug-based charges ("Trial II"), unrelated to the charges in Trial I.

In Trial I, Petitioner Isaiah Brown was convicted after a jury trial in New York Supreme Court, New York County, of Assault in the Second Degree (N.Y. Penal Law § 120.05(2)), and Criminal Possession of a Weapon in the Third Degree (id. § 265.02(1)), for crimes committed against victim Zebedee Pouncey ("Pouncey"), and Assault in the Third Degree (id. § 120.00(1)), Attempted Assault in the First Degree (id. §§ 110.00, 120.10(1)), and Attempted Assault in the Second Degree (id. §§ 110.00, 120.05(2)), for crimes committed against victim Kelly Keegan ("Keegan"). Petitioner was sentenced as a predicate felony offender to concurrent terms of seven years'

imprisonment on the second degree assault conviction and three and one-half to seven years' imprisonment on the weapon possession conviction,[1] to run consecutively to concurrent terms of seven years' imprisonment on the attempted first degree assault conviction, two to four years' imprisonment on the attempted second degree assault conviction, and one year's imprisonment on the third degree assault conviction. Petitioner is currently incarcerated at Otisville Correctional Facility.

In Trial II, Petitioner was convicted after a jury trial in Supreme Court, New York County, of Criminal Possession of a Controlled Substance in the Seventh Degree (id. § 220.03), and two counts of Criminally Using Drug Paraphernalia in the Second Degree (id. § 220.50(2)-(3)). Petitioner was sentenced to a term of one year's imprisonment on the drug possession count, to run consecutively to concurrent terms of one year's imprisonment on the drug paraphernalia convictions. This sentence merged with Petitioner's sentence from Trial I. Petitioner is no longer in state custody under this sentence.

Petitioner seeks habeas relief under 28 U.S.C. § 2254. With respect to Trial I, Petitioner claims that (1) the trial court improperly joined two indictments; (2) the court failed to read back pertinent sections of Pouncey's cross-examination testimony in response to a note from the jury during its deliberations; (3) the

---

[1] Petitioner was originally sentenced to a term of seven years' imprisonment on the weapon possession conviction, which was reduced after it was determined to exceed the statutory maximum.

court improperly limited defense counsel's cross-examination of a prosecution witness; (4) the court improperly re-charged the jury during its deliberations; (5) the court wrongfully excluded Petitioner from sidebar conferences with venirepersons during voir dire; (6) the court adjudged Petitioner a predicate felony offender without affording him due process; (7) Petitioner was denied a speedy trial; (8) Petitioner was denied effective assistance of trial counsel; and (9) Petitioner was denied effective assistance of appellate counsel. With respect to Trial II, Petitioner claims that (1) the court improperly restricted defense counsel's summation; and (2) the court wrongfully excluded Petitioner from a sidebar conference with a venireperson during voir dire. For the reasons that follow, the Court respectfully recommends that the Petition be dismissed with prejudice.

**BACKGROUND**

I.   <u>Trial I</u>

Petitioner was tried on two consolidated indictments, the first involving crimes committed against Pouncey, and the second involving crimes committed against Keegan.[2]

A.   <u>Crimes Committed against Pouncey</u>

1.   <u>The People's Case</u>

Pouncey was a drug user and dealer (<u>see</u> Trial Transcript, vol. 1 ("Tr. A"), at 96-98), who had purchased crack cocaine ("crack") from Petitioner for about five or six years. (<u>See</u> <u>id.</u> at 56.) When

---

[2] The indictments were numbered 5128/96 (Pouncey) and 48/97 (Keegan).

he lacked money, Pouncey would purchase drugs from Petitioner on credit and pay him back later. (See id. at 56-57.)

In late April or early May 1996, Pouncey purchased $50 worth of crack from Petitioner on credit. (See id. at 57, 132.) Over the next few weeks, Petitioner repeatedly demanded the $50 from Pouncey; each time, Pouncey claimed he did not have the money. (See id. at 63-65, 133-37.) At about 11:00 P.M., on May 29, 1996, Petitioner stopped Pouncey in front of his building and again demanded the money. (See id. at 59, 128, 130.)[3] Without waiting for Pouncey to respond, Petitioner thrust an object into Pouncey's body, beneath his armpit. (See id. at 59-61, 128, 130, 138.) Pouncey ran toward 63rd Street and into Roosevelt Hospital. (See id. at 61-63.) Petitioner ran after Pouncey for about fifteen yards, but did not catch him, and stopped chasing him before he reached the hospital. (See id. at 62-63.) Pouncey was treated in the emergency room for a life-threatening knife wound to his chest, which had collapsed his lung. (See id. at 44-45.)

At a June 4, 1996 interview with police officers, Pouncey identified Petitioner as his assailant. (See id. at 168-70.) The officers arrested Petitioner at his apartment that day. (See id. at 177-78.)

On June 11, 1996, Pouncey testified before the grand jury that Petitioner had stabbed him. (See id. at 66-67, 98-99.) However, in October 1996, Pouncey became concerned that Petitioner, who had

---

[3] Pouncey lived at West 62nd Street, between 10th and 11th Avenues, in Manhattan. (See Tr. A at 48-49, 93.)

posted bail, was a danger to Pouncey's mother and himself. (See id. at 68-69, 150.)  Pouncey met with Petitioner, who suggested that Pouncey could sign an affidavit stating that someone else had stabbed him. (See id. at 69-70.)  Pouncey signed an affidavit to that effect that defense counsel prepared. (See id. at 73, 108, 111.)  On November 19, 1996, Pouncey met with an assistant district attorney and signed a notarized statement that someone other than Petitioner had stabbed him, and that he had lied before the grand jury. (See id. at 74, 118, 120, 146-47.)

At trial, Pouncey insisted that Petitioner had, in fact, stabbed him (see id. at 148, 162), and that he had only recanted his grand jury testimony because he had feared for the safety of his mother and himself. (See id. at 72, 75, 108, 111.)

### 2.  The Defense's Case

Petitioner testified in his own defense.  Petitioner claimed that on May 22, 1996, Petitioner and Pouncey had an altercation when Petitioner asked Pouncey about money Petitioner had lent him. Pouncey pushed Petitioner and said "I'm going to get you." (Trial Transcript, vol. 2 ("Tr. B"), at 357; see id. at 355-56, 399.) Petitioner denied having stabbed Pouncey. (See id. at 347, 395, 427.)

After Petitioner was arrested and arraigned, Pouncey contacted him to see how he could "correct the error he had made" when he falsely accused Petitioner of stabbing him. (Id. at 348-49, 403.) Petitioner called defense counsel, who told Petitioner to give Pouncey his business card and have Pouncey call him. (See id. at

5

349-50, 352, 403.)  Petitioner had no further contact with Pouncey. (<u>See</u> <u>id.</u> at 352-53.)

    B.   <u>Crimes Committed against Keegan</u>

       1.   <u>The People's Case</u>

Keegan, like Pouncey, was a drug user and dealer. (<u>See</u> Tr. A at 187.)  Petitioner sold crack to Keegan in exchange for money or sex. (<u>See</u> <u>id.</u> at 189-91, 230-31.)  On occasion, Keegan sold drugs for Petitioner. (<u>See</u> <u>id.</u> at 190.)  She described herself as being "very much in love" with him, and remained in love with him at the time of trial. (<u>Id.</u> at 191; <u>see</u> <u>id.</u> at 230-31.)

On September 30, 1996, Petitioner sold Keegan $10 worth of crack on credit. (<u>See</u> <u>id.</u> at 192-93.)  On October 22, 1996, Keegan, accompanied by Petitioner, went to the apartment of her friend, Nina Johnson ("Johnson"), while high on crack and alcohol. (<u>See</u> <u>id.</u> at 193-94, 231.)  While in Johnson's apartment, and in Johnson's presence, Petitioner asked Keegan for "eighty cents," which was slang for eighty dollars.  Because she was high, Keegan thought Petitioner was actually asking for eighty cents, and she gave Petitioner a subway token. (<u>See</u> <u>id.</u> at 194-96.)  Petitioner hit Keegan in the face. (<u>See</u> <u>id.</u> at 196-97.)  The next thing Keegan remembered was that she was on the kitchen floor, and Petitioner punched her in the face and kicked her in the ribs. (<u>See</u> <u>id.</u> at 197-98, 201.)

Petitioner ordered Keegan to take her clothes off. (<u>See</u> <u>id.</u> at 198-99.)  When she did nothing, Petitioner hit her again. (<u>See</u> <u>id.</u> at 199.)  Petitioner pulled Keegan off the floor by her hair,

turned on a burner of the gas stove, and held her face close enough to it that she felt its heat. (See id. at 202.)  Keegan pushed away from the stove, causing Petitioner to fall backward. (See id. at 203.)  Petitioner told Keegan to wash her face.  She observed, in Johnson's bathroom, that her face was cut and bleeding, and that her fingers hurt so much she feared they were broken. (See id. at 203-04.)

Petitioner then spoke more calmly with Keegan and tried to reconcile with her. (See id. at 205, 232-33.)  Soon afterward, Keegan and Petitioner went to Petitioner's house. (See id. at 205-06, 233.)  Keegan attempted to perform oral sex on Petitioner in his bedroom, but could not because her mouth hurt too much.  She then tried to have intercourse with him, but was unable to do so because her ribs were too badly injured. (See id. at 208-09.)  On both direct and cross-examination, Keegan repeatedly testified that her attempts to have sex with Petitioner were consensual. (See id. at 207-09, 234-35, 239-40.)

Keegan stayed with Petitioner for the rest of the night.  The next morning, Petitioner agreed to let Keegan see her boyfriend Kevin Simpson ("Simpson"), in Queens, so she could get her welfare money and pay Petitioner back. (See id. at 210-12.)  Soon after Keegan met with Simpson, an ambulance arrived, and Simpson identified Petitioner as the person who had injured Keegan. (See id. at 212-13.)

Keegan was treated at the emergency room of St. Clare's Hospital. (See id. at 274.)  She had bruises and swelling on her

7

face, contusions and abrasions over her ribs, and a broken finger. (See id. at 213, 275.)  Her injuries were consistent with having been punched, and possibly kicked, repeatedly. (See id. at 279.)

Keegan refused to press charges against Petitioner. (See id. at 215, 246-47.)  Detective Eddy Lebron ("Detective Lebron" or "Lebron") spoke with Keegan on December 6 and 7, 1996. (See id. at 322.)  On January 2, 1997, Petitioner was arrested for the unrelated offenses that comprised the charges in Trial II. (See id. at 249-50.)  While Petitioner was in custody, Detective Lebron met with him, read him his Miranda rights, and told him he was investigating the rape and assault of Keegan. (See Tr. B at 322, 329.)  Petitioner agreed to proceed without a lawyer, and spoke to Detective Lebron for over two hours. (See id. at 323-24, 329.) Lebron asked Petitioner "what motive Kelly Keegan would have for lying and pointing the finger at him," and "asked him why she would want to put the screws to him." (Id. at 324-25.)  Petitioner responded that Keegan "may be putting the screws to herself in the long run." (Id. at 325.)[4]  Petitioner would not explain this statement.  Detective Lebron then arrested Petitioner for raping and assaulting Keegan. (See id. at 325.)

    2.  The Defense's Case

In his opening statement, defense counsel argued that

---

[4] Prior to trial, Petitioner moved to suppress these statements, and the court held a Huntley hearing. (See generally Proceeding, dated July 15, 1997, Tr. vol. 1.)  Following the hearing, the motion was denied on July 16, 1997. (See Proceeding, dated July 16, 1997, Tr. vol. 1, at 91.)

Petitioner and Keegan were romantically involved, that their sexual contact on October 22, 1996, was fully consensual, and that Keegan herself did not believe she had been sexually assaulted. (See Tr. A at 27-33.)

On direct examination, Petitioner denied ever hitting, raping, or orally sodomizing Keegan, or having observed her in an injured or beaten state. (See Tr. B at 368, 412-13, 420-21, 426-27.) Petitioner denied being in Johnson's apartment on October 22, 1996, and having pushed Keegan's face toward the stove flame. (See id. at 414-15, 417.)  Petitioner testified that, while he had a sexual relationship with Keegan, Keegan was never incapable of performing sexually with him, due to injuries or otherwise. (See id. at 365, 368-69.)  When Petitioner was with Keegan, she was usually high on both cocaine and alcohol (see id. at 364-65), and "hardly ever appeared to be oriented." (Id. at 367.)

When asked whether he had assaulted Keegan as she had testified, Petitioner responded, "I'm a pretty big guy. . . . If I administered the beating that she described in this courtroom, I think I'd have killed her." (Id. at 368.)  On cross-examination, the prosecutor noted that Petitioner laughed when asked if he was present when Keegan's face was forced toward the stove flame.  The following exchange occurred:

> Q.  You were laughing.  Is there something funny about her face being force [sic] into a stove?
> A.   No.
> Q.   Tell the jury why you were laughing?
> A.   I'm six foot two, 240 pounds, relatively good shape. Kelly is how much?  If I wanted to force her face in a fire her face would have been in the fire.  It struck me as – not as funny – but as sad actually.  It is so

9

> preposterous it borders on the ridiculous.
> . . .
> Q.  And Mr. Brown, had you been the one to give her this
> beating she would probably be dead?
> A.  More than likely.

(Id. at 415.)

Petitioner also testified on cross-examination that he could not remember whether he had engaged in sex with Keegan on October 22, 1996. (See id. at 421.)  The prosecutor noted that, in his opening statement, defense counsel had argued that Petitioner and Keegan had engaged in consensual sex that day, and asked Petitioner whether counsel's statement was true. (See id. at 422.)  Petitioner responded that it was "[a]bsolutely not true. . . If he said I said we engaged in consensual sex in his opening statement it was not true." (Id. at 422-23.)

On summation, defense counsel continued to argue that Petitioner had engaged in consensual sex on October 22, 1996. (See id. at 495-96, 499-500.)

### 3.  The People's Rebuttal

The People called Johnson as a rebuttal witness.  She testified that, on October 22, 1996, while at her grandmother's apartment (see id. at 437, 457), she observed Petitioner slap and hit Keegan, as Keegan called out for help. (See id. at 437-39, 442-43.)  She also saw Petitioner hold Keegan and push her head toward a flame on her stove. (See id. at 440-41.)  Keegan pushed away from the stove, causing her and Petitioner to fall backwards. (See id. at 441.)  Petitioner and Keegan then left the apartment together. (See id. at 441-42.)

10

C.    <u>The Verdict</u>

_____Under the Pouncey indictment, Petitioner was convicted of Assault in the Second Degree and Criminal Possession of a Weapon in the Third Degree, and was acquitted of Attempted Murder in the Second Degree.    Under the Keegan indictment, Petitioner was convicted of Assault in the Third Degree, Attempted Assault in the First Degree, and Attempted Assault in the Second Degree.  The jury was unable to reach a verdict on the charges of Rape in the First Degree, Sodomy in the First Degree, Assault in the Second Degree, and a second count of Attempted Assault in the First Degree, and these charges were eventually dismissed.  (<u>See</u> Sentencing Transcript, dated Dec. 9, 1997, Tr. vol. 3, at 4-5, 9-10.)

II.  <u>Trial II</u>

_____On the night of January 2, 1997, Police Officers Patrick Kennedy and Joseph Guiney executed a warrant to search apartment 4C at 248 West 62nd Street. (<u>See</u> Trial Transcript, vol. 3, at 409, 491.)  When they arrived at the location, the officers realized that the warrant had been obtained for the wrong apartment.  They looked out of the hallway window and observed people in the stairwell of 249 West 62nd Street, which they knew to be an area prone to drug trafficking. (<u>See</u> <u>id.</u> at 409-11, 434, 436, 438-39, 491-93, 503.)

The officers went to 249 West 62nd Street and knocked on the door of apartment 4C. (<u>See</u> <u>id.</u> at 411-12, 493-94.)  When someone in the apartment asked who was there, Officer Guiney said "Housing, there's a gas leak and we need to check it out." (<u>Id.</u> at 412; <u>see</u>

11

id. at 440, 494.)  Soon after, Terrence McCrae ("McCrae") opened
the door to the apartment. (See id. at 412, 441, 495.)  McCrae
looked very sick and frail, and was too soft-spoken to have been
the voice that asked who was at the door. (See id. at 413, 316,
441, 495.)

    With the door open, the officers observed a crack pipe, a
marijuana cigarette, and the muzzle of a rifle in the room. (See
id. at 415, 442-43, 453, 496-97, 505.)  The officers asked McCrae
if they could enter, and he agreed. (See id. at 497.)  As the
officers walked toward the back of the apartment, they saw someone
else go into the back bedroom, slam the door, and say "Get the fuck
out, bitch."  The voice sounded similar to the voice that had asked
who was at the door. (See id. at 416-17, 448, 450-52, 497.)  As the
officers were contemplating what to do next, Petitioner came out of
the bedroom. (See id. at 417, 448, 451-54, 461, 497.)  Officer
Guiney withdrew his gun and aimed it at Petitioner. (See id. at
452, 497, 507-08.)  Officer Guiney handcuffed Petitioner, took him
and McCrae into the hallway, and went to get a search warrant for
the premises. (See id. at 418, 497-98.)

    The officers returned to McCrae's apartment with a warrant and
searched it. (See id. at 419, 498.)  The officers found three
"pebble size" rocks of cocaine on top of a jewelry box, one of
which was packaged in a closed, dime-sized ziplock bag with black
x's on it. (See id. at 420-21, 455, 475, 499.)  Inside the box, the
officers found a large plastic bag with twelve clear bags inside,
each containing about one hundred dime-sized bags with x's on them,

of a type generally used to package narcotics, predominantly crack. (See id. at 421-22, 456, 500.) The officers also found a marijuana cigarette, three crack pipes, hypodermic needles, a triple beam scale of a type commonly used to weigh crack, a BB gun that looked like a regular handgun, and a rifle, which was determined to be inoperable. (See id. at 420, 423-24, 459, 499-500.) The officers determined that Petitioner lived in apartment 2E of 249 West 62nd Street, two floors below McCrae's apartment. (See id. at 424.)

The defense presented no witnesses. Petitioner was convicted of Criminal Possession of a Controlled Substance in the Seventh Degree, and two counts of Criminally Using Drug Paraphernalia in the Second Degree. Petitioner was acquitted of Criminal Possession of a Controlled Substance in the Third Degree.

III. Post-Trial Proceedings

    A.   Direct Review

Petitioner, represented by counsel, appealed his convictions in both trials to the Appellate Division, First Department. With respect to Trial I, Petitioner claimed that: (1) the trial court improperly joined the Pouncey and Keegan indictments; (2) the court failed to read back pertinent sections of Pouncey's cross-examination testimony in response to a note from the jury during its deliberations; and (3) the court improperly limited defense counsel's cross-examination of Detective Lebron. In a supplemental pro se brief, Petitioner claimed that: (4) the court improperly re-charged the jury during its deliberations; (5) the court wrongfully excluded Petitioner from sidebar conferences with venirepersons

during voir dire; (6) the court adjudged Petitioner a predicate felony offender without affording him due process; and (7) Petitioner was denied a speedy trial.

With respect to Trial II, Petitioner, also represented by counsel, appealed to the Appellate Division, claiming that: (1) the trial court improperly restricted defense counsel's summation; and (2) the court wrongfully excluded Petitioner from a sidebar conference with a venireperson during voir dire.[5]

On October 18, 2001, the Appellate Division unanimously affirmed Petitioner's convictions. See People v. Brown, 287 A.D.2d 341, 731 N.Y.S.2d 378 (1st Dep't 2001).[6]  Still represented by counsel, Petitioner sought leave to appeal to the Court of Appeals. Leave was denied on January 23, 2002. See People v. Brown, 97 N.Y.2d 702, 739 N.Y.S.2d 102 (2002).

B.   Collateral Review

1.   Motion to Vacate the Judgment

On April 13, 2002, Petitioner, proceeding pro se, moved to vacate his convictions stemming from the crimes he committed against Keegan, pursuant to New York Criminal Procedure Law § 440.10 ("the § 440.10 Motion").  Petitioner contended that his

---

[5] Petitioner also claimed that the verdict in Trial II was based on insufficient evidence and was against the weight of the evidence, and that his sentence was excessive.  Petitioner does not raise these claims before this Court.

[6] The Appellate Division explained its reasoning for denying the claims raised in appellate counsel's brief, but denied Petitioner's pro se claims summarily. See Brown, 287 A.D.2d at 341-42, 731 N.Y.S.2d at 378-79.

14

trial attorney had a conflict of interest and was constitutionally ineffective; his motion contained approximately sixty claims. (See generally Affidavit in Support of Notice of Motion ("Pet'r § 440.10 Aff."), Ex. M to Declaration in Opposition to Petition ("Resp't Decl.").) On September 13, 2002, the New York Supreme Court denied the motion. The court found some claims procedurally barred, as Petitioner could have raised them on direct appeal, but failed to do so. The court found the other claims unsupported by Petitioner's moving papers, contradicted by the court record, or otherwise meritless. (See generally Decision and Order, dated Sept. 13, 2002 ("§ 440.10 Decision"), Ex. O to Resp't Decl.) Petitioner sought leave to appeal to the Appellate Division, First Department. Leave was denied on November 12, 2002. (See People v. Brown, dated Nov. 12, 2002, Ex. P to Resp't Decl.)

       2.   Coram Nobis Petition

      On June 18, 2003, Petitioner, acting pro se, moved for a writ of error coram nobis, claiming that his appellate counsel was ineffective for not raising a claim of ineffective assistance of trial counsel. (See generally Verified Application ("Coram Nobis Pet."), Ex. R to Resp't Decl.) On January 22, 2004, the Appellate Division summarily denied Petitioner's petition. See People v. Brown, 3 A.D.3d 835, 774 N.Y.S.2d 855 (1st Dep't 2004). Petitioner sought leave to appeal to the Court of Appeals, which was denied on March 18, 2004. See People v. Brown, 2 N.Y.3d 738, 778 N.Y.S.2d 463 (2004). The instant habeas proceeding followed.

**DISCUSSION**

I.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a state court conviction "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000); accord Harris v. Kuhlmann, 346 F.3d 330, 342 (2d Cir. 2003); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000). The phrase "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not dicta) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412, 120 S. Ct. at 1523; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002); see also Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001) ("[A] federal habeas court must defer in the

16

manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state does not explicitly refer to the federal claim or to relevant federal case law.").

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identifies the governing legal rule, but applies it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413, 120 S. Ct. at 1523. The inquiry for a federal habeas court is not whether the state court's application of the governing law was erroneous or incorrect, but rather whether it was "objectively unreasonable." See id. at 409, 120 S. Ct. at 1521; Eze v. Senkowski, 321 F.3d 110, 125 (2d Cir. 2003); see also Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001) ("[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently. The state court's application must reflect some additional increment of incorrectness such that it may be said to be unreasonable.").

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom.

17

Parsad v. Fischer, 540 U.S. 1091, 124 S. Ct. 962 (2003). A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).

II.  Misjoinder Claim

     Petitioner contends that the joinder of the Pouncey and Keegan indictments in Trial I rendered the trial fundamentally unfair, and that the trial court erred in denying a motion for severance. Petitioner contends that the indictments were "factually unalike," that the jury could not separate the evidence adduced with respect to each indictment, and that joining the indictments impermissibly interfered with his Fifth Amendment right to testify on his own behalf, since he wanted to testify as to the Pouncey indictment, but not the Keegan indictment. (Petition ("Pet.") at 8-9.) Respondent contends that this claim has no merit. (See Memorandum of Law in Opposition to Petition ("Resp't Mem.") at 33-43.) The Court agrees.

A misjoinder claim may only succeed on habeas review where joinder rendered the petitioner's trial fundamentally unfair. See United States v. Lane, 474 U.S. 438, 446 n.8, 106 S. Ct. 725, 730 (1986) ("Improper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."); Herring v. Meachum, 11 F.3d 374, 377 (2d Cir. 1993)

("Joinder of offenses rises to the level of a constitutional violation only if it 'actually renders petitioner's state trial fundamentally unfair and hence, violative of due process.'") (quoting <u>Tribbitt v. Wainwright</u>, 540 F.2d 840, 841 (5th Cir. 1976)); <u>see also</u> <u>Zafiro v. United States</u>, 506 U.S. 534, 540, 113 S. Ct. 933, 938 (1993) ("[I]t is well-settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials."). Interference with a petitioner's decision to testify due to joinder is considered within a constitutional analysis of whether joinder so prejudiced the defendant as to jeopardize his due process right to a fundamentally fair trial. <u>See</u> <u>United States v. Alexander</u>, 135 F.3d 470, 477 (7th Cir. 1998); <u>Closs v. Leapley</u>, 18 F.3d 574, 578 (8th Cir. 1994); <u>Davis v. Kelly</u>, 2 F. Supp. 2d 362, 366-67 (W.D.N.Y. 1998); <u>Holmes v. Scully</u>, 706 F. Supp. 195, 198-99 (E.D.N.Y. 1989) (citing <u>Alvarez v. Wainwright</u>, 607 F.2d 683, 685 (5th Cir. 1979)). Because joinder of criminal offenses has long been considered constitutionally permissible, a petitioner claiming misjoinder "must, to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from the events as they unfolded during the joint trial." <u>Davis</u>, 2 F. Supp. 2d at 366 (quoting <u>Herring</u>, 11 F.3d at 377-78); <u>see also</u> <u>Herring</u>, 11 F.3d at 378-79 (noting that a petitioner bringing a misjoinder claim bears "an onerous burden," and that habeas relief on fairness grounds is rarely available "[i]n the absence of some affirmative irregularity in the administration of the criminal law by the state").

19

The trial court's refusal to sever the counts did not rise to the level of a constitutional due process violation, and does not appear to have even violated state law. A New York court may join two criminal offenses that "are defined by the same or similar statutory provisions and consequently are the same or similar in law." N.Y. Crim. Proc. Law § 200.20(2)(c). Joinder was clearly proper under this provision, as all of the charges under the indictments were for assault, attempted assault, or conduct related to Petitioner's use of force against Pouncey and Keegan.

Joinder under § 200.20(2)(c) may be challenged on a showing of good cause, which may include situations where "there is a substantial likelihood that the jury would be unable to consider separately the proof as it relates to each offense," id. § 200.20(3)(a), or where the defendant makes a "convincing showing that [he] has both important testimony to give concerning one count and a genuine need to refrain from testifying on the other." Id. § 200.20(3)(b). In any case, however, the court always has discretion to deny a motion for severance, see id. § 200.20(3), unless denial would render the defendant's trial fundamentally unfair. See People v. Lane, 56 N.Y.2d 1, 8, 451 N.Y.S.2d 6, 9 (1982).

In the instant case, the trial court rejected Petitioner's contentions, raised in response to the People's motion for consolidation, that he would be unduly prejudiced by joinder. (See Brief for Respondent to the Appellate Division, First Department ("Resp't App. Br."), Ex. C to Resp't Decl., at 34.) In

reviewing the trial court's refusal to sever the indictments, the Appellate Division found that the charges "involved the same or similar statutory provisions and were joinable pursuant to CPL § 200.20(2)(c)," that "severance was unwarranted since [Petitioner] failed to demonstrate good cause for the severance or that he suffered undue prejudice from the joinder," and that "[t]he proof as to each crime was equally strong and was presented separately, making it easy for the jury to analyze it with respect to each case." Brown, 287 A.D.2d at 341, 731 N.Y.S.2d at 378. The court also found that Petitioner "failed to make a convincing showing that he had important testimony to give concerning one case and a strong need to refrain from testifying in the other." Id. at 341-42, 731 N.Y.S.2d at 378-79.

AEDPA precludes a federal court from granting a petition for a writ of habeas corpus on the ground of misjoinder unless the state court's decision was contrary to, or an unreasonable application of, the United States v. Lane "fair trial" standard, see Bridgewater v. Walker, No. 99 Civ. 2420 (RMB) (KNF), 2003 WL 21738978, at *2 (S.D.N.Y. July 28, 2003), or was based "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This Court cannot conclude that the Appellate Division misapplied United States v. Lane, or unreasonably concluded that Petitioner's jury could have readily considered the evidence regarding each indictment separately.

The Court's review of the trial transcript supports the

21

Appellate Division's finding that the jurors could have easily managed and differentiated the evidence relevant to the separate indictments. The prosecution presented its case in a straightforward fashion, introducing evidence that Petitioner assaulted Pouncey and Keegan separately. On summation, the prosecution contended that it had met its burden of proof as to each individual count, clearly differentiated the evidence pertaining to Pouncey from the evidence pertaining to Keegan, and did not argue or suggest that the jurors should consider Petitioner's propensity to commit violent crimes. See N.Y. Crim. Proc. Law § 200.20(3)(a); Herring, 11 F.3d at 378 ("[B]ecause the evidence with respect to each [crime] was distinct and easily compartmentalized, the risk of jury confusion at petitioner's trial was significantly limited.").

Petitioner contends, however, that the jury "displayed its lack of ability to keep the evidence separate" (Pet. at 8), when it requested "to hear Detective Lebron's testimony as to [Petitioner's] response when Lebron asked him why do you think Mr. Pouncey would have put this on you." (Tr. B at 613.) The trial court immediately realized that the jury had "made a big mistake," as Lebron had questioned Petitioner about Keegan, not Pouncey. (Id. at 615.) The court informed the jury that it had requested testimony that did not exist, as Lebron had never asked Petitioner about Pouncey. (See id.) The next day, the jury submitted another read-back request, this time asking for Lebron's conversation with Petitioner about Keegan. (See id. at 617-18.) The court provided

22

the read-back, without objection. (See id. at 618.)

While Petitioner contends that the jury's first read-back request demonstrates significant jury confusion, and thus actual prejudice (see Pet. at 8; Brief for the Appellant to the Appellate Division, First Department ("Pet'r App. Br."), Ex. A to Resp't Decl., at 20), the Court disagrees. The jury clearly had been confused about Detective Lebron's questioning of Petitioner, and its confusion led to the request for a read-back of non-existent testimony. However, the trial court quickly cured this confusion by informing the jury of its mistake. The next day, the jury demonstrated that it understood the court's instruction when it requested a read-back of Lebron's actual testimony. In the end, the jury either acquitted Petitioner, or could not reach a verdict, with respect to the most serious charges against him under both indictments (attempted murder, rape, and sodomy), and convicted Petitioner of charges that were supported by the evidence. Thus, neither the mistaken read-back request nor any other aspect of the trial indicates that Petitioner suffered actual prejudice as a consequence of joinder.

Furthermore, the trial court appropriately instructed the jury that the indictments were joined "for the convenience of the Court," that "the fact that [Petitioner] was charged with one crime constitutes no proof whatsoever that he committed any other crime charged with respect to either of the victims," and that the jury had "to separate . . . the evidence applicable to Mr. Pouncey from the evidence applicable to Ms. Keegan, and to return a verdict on

23

each crime based solely on the evidence applicable to that crime." (Tr. B at 569.)   Petitioner raises no evidence to overcome the presumption that the jury followed these instructions. See Zafiro, 506 U.S. at 540, 113 S. Ct. at 939; Roldan v. Artuz, 78 F. Supp. 2d 260, 280-82 (S.D.N.Y. 1999) (Report and Recommendation, adopted on Jan. 6, 2000) (citing cases).

Petitioner also contends that he was prejudiced because he could not take the stand with respect to only the Pouncey indictment, and had to testify with respect to the Keegan indictment as well.  However, New York law anticipates that joinder will impose upon a defendant's right to testify on his own behalf. As joinder was made pursuant to New York Criminal Procedure Law § 200.20(2)(c), the trial judge had the discretion to sever the indictments if Petitioner made a "convincing showing that [he had] both important testimony to give concerning one count and a genuine need to refrain from testifying on the other [counts]." Id. § 200.20(3)(b) (emphasis added); see also Closs, 18 F.3d at 578 (noting that a defendant must make a "persuasive and detailed showing regarding the testimony [he] would give on the one count he wishes severed and the reason he cannot testify on the other counts," to require severance as a matter of due process) (citation omitted); People v. Reome, 309 A.D.2d 1067, 1068, 766 N.Y.S.2d 238, 240 (3d Dep't 2003) (finding that severance was not warranted under § 200.20(3)(b) because the defendant "failed to set forth . . . the nature of his testimony, or those counts he sought to refrain from testifying on and the reasons therefor"), leave denied, 2 N.Y.3d

24

805, 781 N.Y.S.2d 304 (2004); cf. Lane, 56 N.Y.2d at 10, 451 N.Y.S.2d at 9 (suggesting that "the possibility of cross-examination regarding specific criminal convictions or prior sordid conduct and the attendant risk of serious impeachment may justify a desire to refrain from testifying on one count but not on another where testimony is essential regardless of the risk of impeachment"). Nothing in the record or Petitioner's submissions to this Court, however, indicates that Petitioner made such a showing at any time when he moved for severance.[7] In fact, Petitioner never provided the court with any specific reason why he could only testify with respect to Pouncey. (See Resp't App. Br. at 33; Pet'r App. Br. at 20.)

Based on the record, therefore, this Court finds that the Appellate Division did not unreasonably apply the United States v. Lane "fair trial" standard when it concluded that the trial court was within its discretion to join the Pouncey and Keegan indictments, and deny Petitioner's motion for severance. Therefore, the Court respectfully recommends that Petitioner's misjoinder claim be dismissed.

---

[7] Petitioner made two attempts to sever the indictments. He opposed the prosecution's motion to consolidate the indictments (see Resp't Mem. at 35-36; Resp't App. Br. at 32-34), and moved to sever the indictments after the court granted consolidation. (See Resp't Mem. at 36-37; Proceeding, dated May 21, 1997, Tr. vol. 1, at 2-4.) Petitioner also moved for a mistrial, after the prosecution rested its case at trial, on the ground that the indictments were improperly joined. (See Resp't Mem. at 37; Tr. B at 338-42.)

III. <u>Improper Read-Back Claim</u>

_____Petitioner contends that he was denied a fair trial when the trial court failed to include certain testimony that was responsive to a read-back request from the jury. (<u>See</u> Pet. at 9-10; Pet'r App. Br. at 25-29.)  As Respondent argues (<u>see</u> Resp't Mem. at 43-47), this claim is meritless.

As a general matter, selecting testimony for a read-back is left to the trial court's discretion. <u>See</u> <u>United States v. Salameh</u>, 152 F.3d 88, 133 (2d Cir. 1998); <u>Cottrel v. New York</u>, 259 F. Supp. 2d 300, 305 (S.D.N.Y. 2003); <u>Johnson v. Walker</u>, 74 F. Supp. 2d 287, 304 (W.D.N.Y. 1999) (Report and Recommendation, adopted on Nov. 15, 1999).  There is no Supreme Court precedent establishing that a court's response to a read-back request may violate the Constitution, although one court has applied the standard of <u>Cupp v. Naughten</u>, which holds that a jury instruction may render a trial fundamentally unfair if "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," to a read-back claim. <u>Deoleo v. Miller</u>, No. 02-CV-6436 (JBW), 2003 WL 23199522, at *5 (E.D.N.Y. Dec. 2, 2003) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S. Ct. 396, 400 (1973)).  In the instant case, however, the trial court's read-back was within its discretion, and did not pose a constitutional concern.

Petitioner refers to a jury note that requested "Mr. Pouncey's testimony from the time he ran away from Mr. Brown up to and including his stay in the hospital," and "[a]ny testimony of

Pouncey regarding the initial contact of police and the initiation of this case." (Tr. B at 613.)  In response to the note, the trial court asked the prosecutor and defense counsel to come to an agreement on what testimony should be read. (See id. at 614.)  The next day, the court provided the read-back based on testimony that both counsel provided. (See id. at 618.)

After the jury returned to its deliberations, defense counsel informed the court that he had "personally missed a portion of testimony" that he believed "should have been read back." (Id. at 623.)  Counsel specified a part of Pouncey's cross-examination in which he was asked about the people he saw when he was running to the hospital. (See id.)  In response to this questioning, Pouncey had testified that he ran past people on the street who he recognized from the neighborhood, but was unable to provide any of their names. (See Tr. A at 138-40; Tr. B 623-24.)  The court denied defense counsel's request to expand the read-back, finding the testimony unresponsive. (See Tr. B at 624.)  Defense counsel raised no other objections with respect to the read-back.

The Appellate Division held that the trial court properly exercised its discretion in denying defense counsel's request, as the proffered testimony "was not part of the information requested and . . . did not impeach any of that testimony." Brown, 287 A.D.2d at 342, 731 N.Y.S.2d at 379.  This holding is neither contrary to nor an unreasonable application of Cupp, see 28 U.S.C. § 2254(d)(1), and is not based on an unreasonable determination of the evidence adduced at trial. See id. § 2254(d)(2).  The read-back

note could have been reasonably construed as a request for Pouncey's testimony with respect to his own actions following the stabbing, and Pouncey never testified on direct examination about observing bystanders as he ran to the hospital. Furthermore, the cross-examination testimony did not meaningfully impeach Pouncey's testimony that he had run to the hospital after being stabbed. That Pouncey could not remember the names of people he passed when running away from a person who had just stabbed him, after sustaining a life-threatening injury, could not have substantially affected his credibility.

For these reasons, the Court finds that the court neither exceeded its discretion in denying defense counsel's request to expand the read-back, nor jeopardized the fundamental fairness of Petitioner's trial. Consequently, Petitioner's read-back claim should be dismissed.

IV.  Limitation of Cross-Examination Claim

Petitioner contends that the trial court improperly restricted his right to confront witnesses when it limited defense counsel's cross-examination of Detective Lebron. (See Pet. at 10-11; Pet'r App. Br. at 30-33.)  Respondent replies that these restrictions were constitutionally appropriate. (See Resp't Mem. at 47-51.)  The Court agrees.

Cross-examination of opposing witnesses is a critical component of the adversarial process, and is guaranteed by the Confrontation Clause. See Delaware v. Fensterer, 474 U.S. 15, 22, 106 S. Ct. 292, 295 (1985) (per curiam); Davis v. Alaska, 415 U.S.

308, 318, 94 S. Ct. 1105, 1111 (1974). The right of cross-examination is not absolute, however, and "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, . . . or interrogation that is repetitive or only marginally relevant." Howard v. Walker, 406 F.3d 114, 129 (2d Cir. 2005) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435 (1986)). A petitioner's Confrontation Clause right is violated when a court's restrictions on cross-examination exceed these reasonable limits, and prohibit the jury from hearing testimony that could affect its perception of the witness's credibility. See id.; see also Mastin v. Senkowski, 297 F. Supp. 2d 558, 601 (W.D.N.Y. 2003) ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility.") (quoting United States v. Rosa, 11 F.3d 315, 336 (2d Cir. 1993)).

        The limitation in question occurred during defense counsel's cross-examination of Detective Lebron. Defense counsel asked Lebron if he knew, when he interviewed Petitioner with respect to charges pertaining to Keegan, that Petitioner had also been indicted for the attempted murder of Pouncey. (See Tr. B at 326.) The prosecutor objected, and, during a sidebar conference, told the court he was concerned that defense counsel was inappropriately attempting to have the jury infer that "there was something improper about the fact that [Petitioner] had a lawyer on another

29

case." (Id. at 327.)   Defense counsel replied that Lebron's awareness of whether Petitioner had a lawyer in the Pouncey case was relevant to the voluntariness of Petitioner's statements to Lebron. (See id. at 327-28.)   The court responded as follows:

> The only reason for asking that question is to raise the inference there was something wrong with [Lebron] asking [Petitioner] a question without having a lawyer present. . . . [Voluntariness] is always an issue and you're free to explore it but you can't ask a question that raises an inference in the jury's mind. . . . And the inference you would like the jury to draw is in fact, legally improper.

(Id. at 328.)   The court thus prohibited defense counsel from asking Lebron about his knowledge of Petitioner's representation in the Pouncey case. (See id.)

The Appellate Division held that this limitation was proper, as Detective Lebron's "knowledge of [Petitioner's] representation by counsel on an unrelated case . . . was irrelevant to the issue of whether the statement [Petitioner] made to [Lebron] was voluntary." Brown, 287 A.D.2d at 342, 731 N.Y.S.2d at 379 (citing People v. Bing, 76 N.Y.2d 331, 559 N.Y.S.2d 474 (1990)).   This holding was neither contrary to, nor an unreasonable application of, established Supreme Court precedent.   The Appellate Division's finding was correct: defense counsel was not precluded from asking whether counsel was present when Petitioner was questioned, and the issue of whether Petitioner was represented in his other case had nothing to do with the voluntariness of Petitioner's statements to Lebron. See Bing, 76 N.Y.2d at 337, 347, 559 N.Y.S.2d at 477, 483.

Furthermore, the trial court appropriately prevented defense counsel from pursuing an improper line of questioning under New

York law. See Richardson v. Artuz, No. 97 CV 2128 (JG), 2004 WL 556688, at *11 (E.D.N.Y. Mar. 22, 2004). When a suspect waives his Miranda rights prior to the commencement of criminal proceedings, and that suspect is represented by counsel solely on unrelated charges, New York law only forbids police questioning about those charges for which the suspect is already represented. Otherwise, the police are free to question the suspect with respect to the charges on which he is unrepresented. See Arkim v. Irving, 996 F. Supp. 245, 250-51 (W.D.N.Y. 1998); Bing, 76 N.Y.2d at 348-51, 559 N.Y.S.2d at 484-85; People v. Middlebrooks, 300 A.D.2d 1142, 1142, 752 N.Y.S.2d 759, 760 (4th Dep't 2002); People v. Cortes, 224 A.D.2d 309, 309-10, 638 N.Y.S.2d 438, 439 (1st Dep't 1996); see also McNeil v. Wisconsin, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991) (interpreting Sixth Amendment right to counsel as "offense specific," and thus mirroring the New York rule). Lebron's questioning was only concerned with Keegan, and was completely unrelated to the Pouncey indictment. Consequently, Lebron was permitted to question Petitioner about Keegan after he waived his Miranda rights, regardless of whether Lebron knew about Petitioner's representation in the Pouncey case. Thus, the court's restriction of defense counsel's cross-examination fell well within its discretion to limit confusing or irrelevant questioning, and did not deprive Petitioner of a meaningful opportunity to put Lebron's credibility at issue. See Howard, 406 F.3d at 129.

For these reasons, the Court recommends that Petitioner's limitation of cross-examination claim be dismissed.

V.   <u>Jury Charge Claims</u>

Petitioner contends that his trial was rendered fundamentally unfair when the trial court gave instructions to the jury during its deliberations regarding the Pouncey indictment charges of Assault in the Second Degree and Criminal Possession of a Weapon in the Third Degree. (<u>See</u> Pet. at 11-12; <u>Pro Se</u> Supplemental Brief for Appellant to the Appellate Division, First Department ("Pet'r Supp. Br."), Ex. B to Resp't Decl., at 12-26.)  Respondent replies that the court was simply clarifying certain matters that had confused the jury. (<u>See</u> Resp't Mem. at 51-54.)  The Court can perceive no error in the instructions.[8]

For a misstatement of law in jury instructions to merit habeas relief, "the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." <u>Davis v. Strack</u>, 270 F.3d 111, 123 (2d Cir. 2001).  The jury instruction, or lack of instruction, must be shown not only to be "undesirable, erroneous, or even 'universally condemned,'" but also to have "so infected the entire trial that the resulting conviction violates due process." <u>Id.</u>

---

[8] Petitioner contends that the Appellate Division's summary denial of this claim, and all other claims raised in Petitioner's <u>pro se</u> appellate brief, was not an adjudication on the merits, and is thus not entitled to AEDPA deference. (<u>See</u> Petitioner's Memorandum of Law in Reply to Opposition to Petition ("Pet'r Reply Mem.") at 23.)  However, the Appellate Division gave no indication that its denial of Petitioner's <u>pro se</u> claims was based on non-substantive grounds. <u>See</u> <u>Brown</u>, 287 A.D.2d at 342, 731 N.Y.S.2d at 379.  Therefore, the Appellate Division's dismissal of these claims constituted an adjudication on the merits. <u>See</u> <u>Sellan</u>, 261 F.3d at 314.

(quoting <u>Cupp</u>, 414 U.S. at 146-47, 94 S. Ct. at 400); <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 437, 124 S. Ct. 1830, 1832 (2004) (per curiam). A federal court must assess a challenged instruction "as the jury understood it, as part of the whole instruction, and indeed, as part of all the proceedings that were observed by the jury." <u>Chalmers v. Mitchell</u>, 73 F.3d 1262, 1267 (2d Cir. 1996).

When initially charging the jury with respect to the charges relating to Pouncey, the trial court set forth the elements of the Assault in the Second Degree and Criminal Possession of a Weapon in the Third Degree counts, noting that the crimes involved Petitioner's possession or use of a "dangerous instrument." (<u>See</u> Tr. B at 573-78.)[9] The court provided the statutory definition of "dangerous instrument," but did not specifically mention that a knife could be a dangerous instrument. (<u>See</u> <u>id.</u> at 574.) The trial court's definition of "dangerous instrument" was consistent with the statutory definition. (<u>See</u> <u>id.</u>)[10]

_____

[9] A defendant commits Assault in the Second Degree when, "[w]ith intent to cause physical injury to another person, he causes such injury to such a person . . . by means of a deadly weapon or dangerous instrument." N.Y. Penal Law § 120.05(2). A defendant commits Criminal Possession of a Weapon in the Third Degree when he possesses a "dangerous instrument," such as a knife, with the intent to use it unlawfully against another, and has been previously convicted of any crime. <u>See</u> <u>id.</u> §§ 265.02(1), 265.01(2).

[10] A "dangerous instrument" is "any instrument, article or substance . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(13).

The jury subsequently returned a note asking the court to repeat its charge with respect to the Pouncey charges. (See id. at 603.)  The court repeated the charge, again defining the term "dangerous instrument." (See id. at 607-11.)  The court noted that "[i]n this case the allegation is that the dangerous instrument was a knife." (Id. at 609.)

The next day, the jury returned a note asking the court whether it could convict Petitioner of second degree assault in the Pouncey case without convicting him of third degree weapon possession, and also requesting that the court repeat the weapon possession charge. (See id. at 624.)  The court remarked to the prosecutor and defense counsel that the jury had asked "a profound legal question," and that an answer would have to wait until some research could be done. (Id.; see id. at 625-28.)  The court informed the jury that an answer would take some time (see id. at 635-36), and then discussed with the prosecutor and defense counsel what answer it should give. (See id. at 638-49.)  The prosecutor informed the court that, pursuant to People v. Brewer, 186 A.D.2d 88, 88, 588 N.Y.S.2d 766, 766 (1st Dep't 1992), the jury could properly convict Petitioner of assault and acquit him of weapon possession. (See Tr. B at 639, 649.)  The court agreed with this analysis, and defense counsel offered no objection. (See id. at 639.)

The prosecutor then noted that one possible reason for the jury's confusion was that the it may have thought that it had to find beyond a reasonable doubt that Petitioner possessed a knife,

34

as opposed to any dangerous instrument. (See id. at 640-42.)  The prosecutor requested that the court re-charge the jury on the weapon possession count without using the word "knife." (See id. at 643.)  Defense counsel replied that the jury "had not requested any additional instruction," and had "given [the court] a note which asks for a very narrow answer." (Id. at 648.)  The prosecutor agreed that the jury was looking for a simple "yes or no" answer. (Id. at 649.)

When the jury returned, the court informed it that it could convict Petitioner of assault and acquit him of weapon possession. (See id. at 650-51.)  The court then re-charged the jury on the assault and weapon possession counts, explaining every element of each count. (See id. at 651-55.)  The court again gave the statutory definition of "dangerous instrument," but did not use the word "knife." (See id. at 653-54.)  The court noted that "[t]he People do not have to prove any particular dangerous instrument was used but they must prove that a dangerous instrument was used or in the case of possession that a dangerous instrument was possessed." (Id. at 655.)  The court also noted that "the People have to prove all of this beyond a reasonable doubt.  That never changes." (Id. at 653.)  Defense counsel raised no objection to these instructions.

Petitioner contends that the court

constructively amended the indictment, negated an element of a count in the indictment, varied the People's theory of prosecution, impinged upon the jury's province as fact finder, bolstered and vouched for the People's summation, and contributed to [P]etitioner's conviction when it recharged the jury over counsel's objections and without

35

a jury request for further instruction.
(Pet. at 12.)  These claims are clearly meritless.  The court did not amend the indictment, omit any elements of the charges, or vouch for the prosecution in any way.  Instead, the court correctly answered the jury's specific question (could it convict Petitioner of second degree assault without convicting him of third degree weapon possession), properly re-charged the jury on weapon possession pursuant to its request, and also re-charged the jury on assault.  The court correctly listed the elements of each crime, defined all relevant statutory terms (such as "dangerous instrument"), and established that the prosecution bore the burden of proving each element beyond a reasonable doubt.  Consequently, this Court can identify no state law error in the court's instructions, much less an error that "so infected the entire trial" that Petitioner was deprived of due process, <u>Davis</u>, 270 F.3d at 123, and recommends that this claim be dismissed.[11]

## VI. <u>Exclusion from Voir Dire Sidebar Conference Claim (Trial I)</u>

Petitioner contends that he was denied his Sixth Amendment right to be present at all material stages of his trial when he was

_____

[11] Petitioner also argues that "since said recharge did not include the attempted murder count in the indictment it lead [sic] the jury to believe that the People had to prove a knife was involved in that count consistent with the People's theory of prosecution." (Pet. at 12.)  This claim makes little sense, as an instruction that led the jury to believe that the prosecution had to prove Petitioner's possession of a knife (as opposed to any dangerous instrument) would have benefitted the defense, not the prosecution.  Petitioner also fails to explain how the court's decision not to re-charge the jury on attempted murder could have prejudiced him in any way.

excluded from sidebar conferences during which the court questioned three venirepersons. (See Pet. at 12-13; Pet'r Supp. Br. at 42-45.) Respondent replies that the Appellate Division properly denied Petitioner's claim on the merits. (See Resp't Mem. at 54-57.) The Court agrees.

A criminal defendant has the right "to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings," including the impaneling of the jury. Cohen v. Senkowski, 290 F.3d 485, 489 (2d Cir. 2002) (quoting Faretta v. California, 422 U.S. 806, 819 n.15, 95 S. Ct. 2525, 2533 (1975)). However, this right is not absolute, and ends "when presence would be useless, or the benefit but a shadow." Id. (quoting Snyder v. Massachusetts, 291 U.S. 97, 106-07, 54 S. Ct. 330, 332 (1934)). Thus, while a defendant has the right to be present at a pre-trial screening of venirepersons, this right does not extend to particular conferences between judges, potential jurors, and counsel. Id. at 489-90; accord United States v. Gagnon, 470 U.S. 522, 526-27, 105 S. Ct. 1482, 1484-85 (1985) (per curiam). It is well-established that a defendant has no federal constitutional right to be present at sidebar conferences during voir dire. See Ellis v. Phillips, No. 04 Civ. 7988 (SHS) (AJP), 2005 WL 1637826, at *13 (S.D.N.Y. July 13, 2005) (Report and Recommendation, adopted on Aug. 5, 2005) (citing cases); see also United States v. Feliciano, 223 F.3d 102, 111 (2d Cir. 2000) (noting the absence of any case "in which an appellate court has found a structural defect where a defendant was present throughout but unable to hear a

circumscribed portion of <u>voir dire</u>," and where the defendant could consult with counsel afterward).[12]

At the beginning of voir dire in Trial I, the trial court asked if anyone had difficulty understanding English. (<u>See</u> Proceeding, dated July 21, 1997, Tr. vol. 1, at 39.) After three venirepersons said that they did, the court asked them to approach the bench along with the prosecutor and defense counsel. (<u>See</u> <u>id.</u> at 39-40.) The court then held brief sidebar conferences with each of the venirepersons, in which it asked them simple questions about their employment, their native languages, and the languages they spoke at home. (<u>See</u> <u>id.</u> at 40-44.) Two of the potential jurors, Eduardo Camillo ("Camillo") and Pasqual Diquante ("Diquante"), were excused due to their problems understanding English. (<u>See</u> <u>id.</u> at 41-44.) The third venireperson, Ann Mamaire ("Mamaire"), was reseated after her sidebar conference. (<u>See</u> <u>id.</u> at 40-41.) When Mamaire was called into the jury box for voir dire questioning, she stated in open court that she had two friends who had been raped, "one repeatedly," and had "seen what it has done to them." (<u>Id.</u> at 252-53.) The prosecutor and defense counsel consented to have Mamaire excused. (<u>See</u> <u>id.</u> at 254.)

The perfunctory questioning of venirepersons that took place in Petitioner's absence, but with defense counsel present, clearly

---

[12] By contrast, New York law provides defendants the broader right to be present at any sidebar conference during voir dire in which the court "explore[s] prospective jurors' backgrounds and their ability to weigh the evidence objectively." <u>People v. Antommarchi</u>, 80 N.Y.2d 247, 250, 590 N.Y.S.2d 33, 35 (1992).

qualifies as a "minor occurrence" that did not implicate Petitioner's right to be present at his trial. Gagnon, 470 U.S. at 527, 105 S. Ct. at 1485. Thus, Petitioner's claim presents no cognizable constitutional issue for this Court to consider. See Cohen, 290 F.3d at 490; Ellis, 2005 WL 1637826, at *15. Furthermore, even if the sidebar conferences did implicate a constitutional right, any error stemming from Petitioner's absence from the sidebar conferences would have been harmless, as Camillo, Diquante, and Mamaire were all excused from the jury for cause. See Ellis, 2005 WL 1637826, at *15.[13]

Consequently, the Court recommends that this claim be dismissed.

VII. Sentencing Claim

Petitioner contends that he was denied due process when the trial court adjudicated him a predicate felony offender. (See Pet. at 13-14; Pet'r Supp. Br. at 45-48.) Respondent replies that this claim is meritless. (See Resp't Mem. at 57-61.) The Court agrees.

As a general matter, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992); accord Dorsey v. Irvin, 56 F.3d 425, 427 (2d Cir. 1995). However, procedural violations occurring during sentencing

---

[13] The Court additionally notes that, even if Petitioner did have a constitutional right to be present at the sidebar conferences, he waived that right when neither he nor his counsel objected to his exclusion from them. See Cohen, 290 F.3d at 491-92; Ellis, 2005 WL 1637826, at *14.

are cognizable on habeas review as due process claims. See Love v. Garvin, No. 97 CV 4909 (SJ), 2004 WL 1810342, at *4 (E.D.N.Y. Aug. 9, 2004); Alexis v. Smith, No. 03 Civ. 391 (SAS), 2003 WL 22434154, at *6 (S.D.N.Y. Oct. 24, 2003).

At Petitioner's sentencing proceeding on September 18, 1997, the prosecutor presented Petitioner with a predicate felony statement charging him with a prior felony conviction, dated June 8, 1992, for Attempted Grand Larceny in the Third Degree. (See Proceeding, dated Sept. 18, 1997, Tr. vol. 2, at 13-15.) Petitioner admitted that he had been convicted of this crime, but announced that he wished to challenge the constitutionality of the conviction. (See id. at 15-16.)  Petitioner was unable to provide the court with a ground for this challenge, and requested a two-day adjournment pursuant to New York Criminal Procedure Law § 400.21. (See id. at 16-17.)  The court replied that § 400.21 did not entitle Petitioner to such an adjournment. (See id. at 17-18.) Petitioner then articulated four grounds for challenging the grand larceny conviction: he was denied effective assistance of counsel, he was "never appraised [sic] of the true nature of the allegations served against" him, "[t]he People proceeded without jurisdiction," and he was denied the opportunity to confront his accuser. (Id. at 18-19.)  The court ordered the prosecutor to obtain the record from the grand larceny case, and scheduled a hearing for September 29, 1997. (See id. at 20-21.)

At the hearing, the court announced that it had reviewed the Appellate Division's denial of Petitioner's appeal in the grand

larceny case. (See Sentencing Transcript, dated Sept. 29, 1997 ("Sent. Tr."), Tr. vol. 2, at 2-3.)  Petitioner had raised a claim of ineffective assistance of counsel, a claim that the prosecution had withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and a claim that he had been subjected to improper cross-examination concerning his use of aliases, all of which the Appellate Division had denied on the merits. See People v. Brown, 219 A.D.2d 561, 562, 631 N.Y.S.2d 828, 829 (1st Dep't), leave denied, 86 N.Y.2d 872, 635 N.Y.S.2d 953 (1995).  The sentencing court explained why all three of these claims were meritless. (See Sent. Tr. at 2-5.)  The court did not discuss the claims Petitioner mentioned at the September 18 hearing, presumably because the claims had never been raised on appeal.  The court also noted that Petitioner's status as a second felony offender was res judicata, as he had already been adjudicated a second felony offender at his 1992 sentencing for attempted grand larceny. See id. at 3; Brown, 219 A.D.2d at 562, 631 N.Y.S.2d at 829.  The court asked Petitioner and defense counsel if they had anything to add on the issue of Petitioner's status as a predicate felon, and both said they did not. (See Sent. Tr. at 5.)  Defense counsel then said "we're prepared to accept the court's ruling on that issue and proceed to sentence." (Id. at 5.)  The sentencing court found that the Appellate Division had addressed and disposed of Petitioner's constitutional challenges to his grand larceny conviction, and adjudicated Petitioner a second felony offender. (See id. at 5-6.)

41

Petitioner now contends that the court erred when, at the September 18 hearing, it refused to provide him with a two-day adjournment to give him time to articulate constitutional challenges to his prior conviction, and thus left him "unable to present the constitutional challenges he could have supported had he been afforded the . . . adjournment." (Pet. at 14.) There is no Supreme Court law which requires a sentencing court to adjourn sentencing so that a defendant can formulate a reason why his sentence would be improper. Moreover, it is clear that the sentencing court's treatment of Petitioner's challenges to his prior conviction was appropriate even under state law. Contrary to Petitioner's contention, New York Criminal Procedure Law § 400.21 does not guarantee a defendant a two-day adjournment from the date of a sentencing proceeding to articulate constitutional challenges to a prior felony conviction. Instead, § 400.21 provides that, if a court must hold a hearing to determine whether a defendant may be adjudicated a predicate felony offender, see N.Y. Crim. Proc. Law § 400.21(5), the defendant is entitled to a two-day adjournment if he has not received a copy of the prosecutor's predicate felony conviction statement within two days of the hearing. See id. § 400.21(6). There is nothing in § 400.21 that permits a defendant extra time to formulate his challenges to a predicate felony conviction statement. See id. § 400.21(3) (requiring a defendant to specify any challenges to a predicate felony conviction statement at the time he receives the statement, and noting that "[u]ncontroverted allegations in the statement shall be deemed to

42

have been admitted by the defendant").

In the instant case, Petitioner received a hearing eleven days after he received the predicate felony conviction statement and announced he wished to challenge the constitutionality of that conviction.  The trial court reviewed the record and correctly determined that the Appellate Division had dismissed Petitioner's direct appeal, and that Petitioner's conviction was constitutionally obtained.  Both Petitioner and his counsel explicitly declined to articulate any additional challenges to the 1992 conviction, and did not request the court to review the grounds Petitioner articulated at the September 18 proceeding. Defense counsel then announced that Petitioner consented to be sentenced as a second felony offender, thus waiving any challenge to the court's adjudication of Petitioner's second felony offender status.  Furthermore, even in his Appellate Division brief and the instant Petition, Petitioner fails to articulate what his constitutional claims would have been had he received the two-day adjournment he requested at the September 18 proceeding.  Thus, not only was the scheduling of Petitioner's sentencing hearing consistent with state law, but Petitioner fails even to allege how he was unfairly prejudiced by the court's refusal to grant Petitioner an adjournment.

Finally, the court correctly noted that Petitioner had already been adjudicated a second felony offender in the 1992 case.  Under New York law, this holding, which Petitioner never challenged, was binding on Petitioner in all future proceedings.  See N.Y. Crim.

Proc. Law § 400.21(8); Ennis v. Walker, No. 00 Civ. 2875 (DAB) (AJP), 2001 WL 409530, at *18 (S.D.N.Y. Apr. 6, 2001) (Report and Recommendation, adopted on May 16, 2001); People v. Alston, 1 A.D.3d 627, 630, 766 N.Y.S.2d 724, 727 (3d Dep't 2003), leave denied, 1 N.Y.3d 594, 776 N.Y.S.2d 228 (2004). Consequently, the sentencing court's finding that Petitioner was a second felony offender was completely appropriate under both state and federal law.

For these reasons, the Court recommends that this claim be dismissed.

VIII. Speedy Trial Claim

Petitioner contends that the state court "made erroneous factual findings that are not support[ed] in the record" (Pet. at 17), and denied him due process by ruling on his speedy trial motion prior to the People's submission of a response to the motion, and by failing to hold a hearing on his motion. (See id. at 16-17.) Respondent replies that this claim is not cognizable on federal habeas review, and otherwise lacks merit. (See Resp't Mem. at 71-73.) The Court agrees.

On June 3, 1997, Petitioner submitted a pro se motion to dismiss the Pouncey indictment, contending that the People had failed to try him until 246 days after he had been indicted, thus denying Petitioner a speedy trial under state and federal law. (See Pet'r App. Br. at 26; Resp't App. Br. at 63.) The trial court denied the motion, finding that the People had tried Petitioner within six months of charging him, not including any excludable

44

time. (<u>See</u> Pet'r App. Br. at 26-27; Res't App. Br. at 63-64.)[14]
Thus, Petitioner had received a speedy trial under New York law.
<u>See</u> N.Y. Crim. Proc. Law § 30.30(1)(a).

Following his conviction, Petitioner appealed the denial of
his speedy trial claim, arguing that the Pouncey indictment should
have been dismissed because the People failed to serve him with a
copy of their response to his motion, and because the People failed
to prove their entitlement to their excluded time. (<u>See</u> Pet'r App.
Br. at 42.)  As noted, the Appellate Division summarily denied this
claim. <u>See</u> <u>Brown</u>, 287 A.D.2d at 342, 731 N.Y.S.2d at 379.

On January 5, 2002, Petitioner filed a motion in the New York
Supreme Court to renew his original motion for dismissal of the
indictment on speedy trial grounds. (<u>See</u> Affidavit in Support of
Notice of Motion for Leave to Renew, dated Jan. 5, 2002 ("Leave
Aff."), Ex. 6 to Pet.)  Petitioner essentially argued in this
motion that denial of his original speedy trial motion was improper
because the People had not filed a response to that motion. (<u>See</u>
<u>id.</u> ¶¶ 19-22.)

In an opinion dated May 29, 2002, the court denied the motion.
The court found that Petitioner admitted in his own motion papers
that he had received a copy of the People's response from his
counsel, and that it was "inconceivable that the People would
prepare opposition to the motion to dismiss and only serve it upon
[Petitioner] and not file it with the court." (<u>People v. Brown</u>,

---

[14] Petitioner's <u>pro</u> <u>se</u> speedy trial motion and the trial
court's denial of the motion are not contained in the record.

Decision & Order, dated May 29, 2002 ("Mot. Denial"), Ex. 7 to Pet., at 2.)  The court also observed that if Petitioner's motion had truly been unopposed, the reviewing court would have noted this fact in its decision.  The court acknowledged that the People's response was now unavailable, but held that this fact did not entitle Petitioner to renew his speedy trial motion.  Consequently, the court denied Petitioner's motion to renew. (See id.)

Petitioner's speedy trial claims before this Court are clearly meritless.  Petitioner claims pertaining to the People's alleged failure to file a response to the motion prior to the court's decision, and the Supreme Court's failure to provide Petitioner with a hearing (see Pet. at 16-17) (citing N.Y. Crim. Proc. Law § 210.45), pertain to alleged errors of state law, and are not cognizable on habeas review. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 480 (1991); Martinez v. Senkowski, No. 97-CV-0624 (FJS) (GLS), 2000 WL 888031, at *9 n.9 (N.D.N.Y. June 28, 2000).

Furthermore, Petitioner fails even to state a claim of procedural error under New York law.  As the New York Supreme Court found, Petitioner's claim that the People failed to file a response to his speedy trial motion is refuted by his own admission that he had received such a response, and the improbability that the People would have served this response upon Petitioner without filing it with the court. (See Mot. Denial at 1-2; Leave Aff. ¶ 7; Reply Affidavit to Respondent's Response to Motion for Leave to Renew, dated Apr. 6, 2002, Ex. 6 to Pet., ¶¶ 6-9.)  In addition, since

46

Petitioner's speedy trial motion was not adopted by his counsel, Petitioner was not entitled to a hearing on his motion under New York law. See People v. Rodriguez, 262 A.D.2d 58, 58, 692 N.Y.S.2d 25, 26 (1st Dep't 1999), rev'd on other grounds, 95 N.Y.2d 497, 719 N.Y.S.2d 208 (2000).

Moreover, with respect to Petitioner's claim that the prosecution failed to commence his trial within the time required under Criminal Procedure Law § 30.30, it is well-established that a speedy trial claim brought pursuant to § 30.30 is not cognizable on federal habeas review. See Walker v. Bennett, 262 F. Supp. 2d 25, 30 (W.D.N.Y. 2003); Delvalle v. Sabourin, No. 00 Civ. 3302 (HB) (FM), 2002 WL 1000968, at *3 (S.D.N.Y. May 16, 2002) (Report and Recommendation, adopted on July 17, 2002); see also Pjetrovic v. Bennett, No. 00 Civ. 0398 (VM) (RLE), 2002 WL 32780, at **3-4 (S.D.N.Y. Jan. 3, 2002) (Report and Recommendation, adopted on Feb. 8, 2002) (discussing differences between a § 30.30 speedy trial claim and a Sixth Amendment speedy trial claim). Thus, even if the Supreme Court and Appellate Division erroneously concluded that Petitioner's motions lacked merit under § 30.30, Petitioner would not be entitled to habeas relief on speedy trial grounds unless he was denied his Sixth Amendment right to a speedy trial. Even assuming the truth of all of Petitioner's contentions, Petitioner cannot establish a constitutional violation.

A constitutional speedy trial analysis employs a balancing test comprised of four factors: "(i) the length of the delay; (ii) the reason for the delay; (iii) the defendant's assertion of his

right; and (iv) the prejudice to the defendant resulting from the delay." Delvalle, 2002 WL 1000968, at *4 (quoting Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)); accord Doggett v. United States, 505 U.S. 647, 651, 112 S. Ct. 2686, 2690 (1992). The alleged 243-day delay between Petitioner's indictment and trial would have been "considerably shorter" than the delays in numerous cases where the Second Circuit has denied constitutional speedy trial claims. Flowers v. Warden, 853 F.2d 131, 133 (2d Cir. 1988) (citing cases); see also Rayborn v. Scully, 858 F.2d 84, 89 (2d Cir. 1988) (denying speedy trial claim when delay was over seven years); Holden v. Miller, No. 00 Civ. 926 (RMB) (AJP), 2000 WL 1121551, at *10 (S.D.N.Y. Aug. 8, 2000) (Report and Recommendation, adopted on Oct. 13, 2000) (a delay of approximately two and one-half years "does not offer support" for a speedy trial claim). Furthermore, Petitioner has not shown that the state "purposefully delayed bringing Petitioner to trial in order to gain a tactical advantage," Wilson v. Goord, No. 00 Civ. 4849 (LTS), 2004 WL 226149, at *6 (S.D.N.Y. Feb. 6, 2004), and, most importantly, fails to establish any prejudice resulting from the delay. See Delvalle, 2002 WL 1000968, at *5. Therefore, this Court concludes that any constitutional speedy trial claim would be meritless, and recommends that this claim be dismissed.

IX. Ineffective Assistance of Trial Counsel Claims

     Petitioner raises dozens of claims pertaining to his representation at Trial I, contending that his counsel failed him

at every stage of the trial process.[15]    These claims, while numerous, are unsupported by the record, and are belied by the clearly effective representation that defense counsel provided, which culminated in Petitioner avoiding convictions for the most serious charges he faced, including rape, sodomy, and murder.

A.    Standard of Review

To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must establish (1) that his attorney's performance was so deficient that it "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064 (1984), and (2) that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068; accord Cox v. Donnelly, 387 F.3d 193, 197 (2d Cir. 2004).

In evaluating the reasonableness requirement, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (internal quotation marks omitted); accord Cox, 387 F.3d at 198. The Second Circuit has defined a "strategic decision" as a

---

[15] The Court notes that most of Petitioner's claims involve solely the Keegan indictment, and that Petitioner raises no claims that pertain exclusively to counsel's performance with respect to the Pouncey indictment.

"conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." Cox, 387 F.3d at 198 (quoting Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001)).  A court must not use hindsight "to criticize unsuccessful trial strategies." Eze, 321 F.3d at 132; accord Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; Cox, 387 F.3d at 198.

The "reasonable probability" of the second Strickland prong is defined as "a probability sufficient to undermine confidence in the outcome" of the trial. Strickland, 446 U.S. at 694, 104 S. Ct. at 2068; see also Cox, 387 F.3d at 199 ("The level of prejudice [a petitioner] need demonstrate lies between prejudice that had 'some conceivable effect' and prejudice that more likely than not altered the outcome in the case.") (quoting Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001)).  A court must review the prejudicial effect of trial counsel's errors in the aggregate. See Lindstadt, 239 F.3d at 199.  "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 446 U.S. at 700, 104 S. Ct. at 2071.

Finally, "[f]or [Petitioner] to succeed, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  Rather, he must show that [the court] applied Strickland to the facts of his case in an objectively

50

unreasonable manner." <u>Bell v. Cone</u>, 535 U.S. 685, 698-99, 122 S.

Ct. 1843, 1852 (2002).

    B.   <u>Summary of Petitioner's Claims</u>

As Petitioner does not organize or summarize his claims, the

Court will attempt to do so here. Many of Petitioner's claims are

conclusory and sparsely explained.

    1.   <u>Conflict of Interest Claims</u>

Petitioner contends that his trial counsel, Howard Meyer

("Meyer"),[16] was uninterested in providing Petitioner with a

successful defense, for a variety of reasons.

    a.   <u>Meyer's Antagonism Toward Petitioner</u>

According to Petitioner, prior to trial, Meyer informed

Petitioner that he thought Petitioner was guilty, that he would

"not do his best at trial," that "Black men should stay away from

White women," and made "various other . . . comments indicative of

his intent to see [Petitioner] convicted." (Pet'r § 440.10 Aff. ¶

14; <u>see</u> Defendant's Memorandum of Law in Support of Motion to

Vacate Judgment ("Pet'r § 440.10 Mem."), Ex. M to Resp't Decl., at

10-11.) Meyer also encouraged Petitioner to take a guilty plea.

(<u>See</u> Pet'r § 440.10 Aff. ¶ 14.)

    b.   <u>Meyer's Friendship with the Prosecutor</u>

Meyer was a "good friend" of the prosecutor. (<u>See</u> <u>id.</u> ¶ 17.)

---

[16] According to Petitioner, Meyer became Petitioner's
counsel on or about May 28, 1997. (<u>See</u> Pet'r § 440.10 Aff. ¶ 12.)
Petitioner was previously represented by Richard Verchick, whom
Meyer replaced after Petitioner made a <u>pro</u> <u>se</u> motion for
reassignment of counsel. (<u>See</u> <u>id.</u> ¶ 6; Proceeding, dated May 21,
1997, Tr. vol. 1, at 4.)

His friendship with the prosecutor caused him to assist the prosecution in securing Petitioner's conviction. (See id. ¶ 25.) At trial, Meyer sat at the prosecutor's table. (See id. ¶ 35 at O.)

### c.   Meyer's Pecuniary Interest in a Conviction

Meyer wanted Petitioner to be convicted, because he owned stock in various private prison companies and bonds used to finance prison construction, and thus had an interest "in ensuring that the prison population remains as high as possible." (Pet'r § 440.10 Mem. at 11-12.)

### d.   Meyer's Failure to Consult with Petitioner in Planning a Defense

Meyer refused to consult with Petitioner on matters of defense strategy, and "failed to tell [Petitioner] what defense he intended to use at trial." (Pet'r § 440.10 Aff. ¶ 27.)  When Meyer presented his defense with respect to the Keegan indictment, it deviated from the version of events Petitioner provided in his testimony. (See id. ¶¶ 31, 36.)  Meyer and Petitioner disagreed on virtually every aspect of Petitioner's defense. (See id. ¶ 36; Pet'r § 440.10 Mem. at 9, 25-26, 36-37.)

### e.   Meyer's Failure to Determine Petitioner's Willingness to Testify and Provide Adequate Preparation

Prior to trial, Petitioner informed Meyer that he wished to testify with respect to the Pouncey charges. (See Pet'r § 440.10 Aff. ¶ 31.)  Meyer decided, without telling Petitioner, that Petitioner would not testify at trial at all, and thus "totally disregarded [Petitioner's] desire to testify" (id.), and "insisted" that Petitioner not testify. (Id. ¶ 38.)  Once Petitioner demanded

to testify, Meyer refused to prepare Petitioner for direct examination. (See id. ¶¶ 35 at B, 36 at C, 50.)

> f. Inadequate Investigation

Meyer's investigator, Ronald Dwyer ("Dwyer"), interviewed Keegan and taped the conversation. Meyer never allowed Petitioner to listen to the tape, but gave the tape to the prosecutor. (See id. ¶ 17.)

Meyer failed to have Dwyer interview Simpson, subpoena Keegan's psychiatric records, have Keegan submit to a psychiatric examination, or investigate Keegan's "propensity to fabricate charges." (Id. ¶ 27.) In fact, Dwyer's investigation of Keegan was "either totally inadequate, or almost totally suppressed by Meyer." (Id. ¶ 28; see Pet'r § 440.10 Mem. at 13-14.) Meyer limited Dwyer's investigation, and avoided cross-examining Keegan on any issue involving Dwyer (such as the tape Dwyer made of his conversation with Keegan), because he wanted to protect Dwyer from being called as a prosecution witness. (See Pet'r § 440.10 Aff. ¶¶ 28, 43.) Meyer did not want the prosecutor to call Dwyer because the prosecutor "had accused Dwyer of engaging in unethical and/or illegal conduct when performing the investigation relevant to the [Keegan] indictment." (Id. ¶ 43; see Pet'r § 440.10 Mem. at 11.)

Petitioner requested from Meyer a tape of the 911 call Keegan and Simpson made, a transcript of this call, and a tape of Detective Lebron's questioning of Petitioner. Meyer never provided these materials. (See Pet'r § 440.10 Aff. ¶ 18; Pet'r § 440.10 Mem. at 15-16.) Had Meyer obtained the Lebron tape, he would have been

able to have Lebron's statements suppressed at the pre-trial
<u>Huntley</u> hearing. (<u>See</u> Pet'r § 440.10 Aff. ¶ 19; Pet'r § 440.10 Mem.
at 15-16.)

Meyer also failed "to obtain the plea minutes" of Keegan and
Johnson's pleas to prior crimes. (Pet'r § 440.10 Aff. ¶ 35 at T;
<u>see</u> Pet'r § 440.10 Mem. at 26-27.)

2.    <u>Pre-Trial Claims</u>

a.    <u>The Huntley Hearing</u>

At the pre-trial <u>Huntley</u> hearing, Meyer "permitted [the
prosecutor] to call" Officer Kennedy to testify about evidence
pertaining to Trial II, for the purpose of establishing that
Petitioner was a drug dealer, and that his assaults on Pouncey and
Keegan were for the common scheme or plan of collecting drug debts.
(Pet'r § 440.10 Aff. ¶ 20; <u>see</u> Pet'r § 440.10 Mem. at 15, 20.)

Meyer failed to cross-examine the prosecutor, when he
testified at the <u>Huntley</u> hearing, concerning the filing of the
Keegan indictment. (<u>See</u> Pet'r § 440.10 Aff. ¶ 26; Pet'r § 440.10
Mem. at 16-17.)

b.    <u>Failure to Move to Dismiss the Indictment</u>

Meyer failed to move to dismiss the Keegan indictment when
Keegan told Dwyer that she "did not consider herself a sex crime
victim." (Pet'r § 440.10 Aff ¶ 35 at M; <u>see</u> Pet'r § 440.10 Mem. at
29.)

c.    <u>Failure to Sever the Indictments</u>

In his motion to sever the Pouncey and Keegan indictments,
Meyer failed to argue that Petitioner had important testimony to

give with respect to the Pouncey indictment, but had an important reason to refrain from testifying with respect to the Keegan indictment. (See Pet'r § 440.10 Aff. ¶¶ 22-24; Pet'r § 440.10 Mem. at 19-20.)

After the court denied the motion for severance, Meyer failed to make a motion _in_ _limine_ "to preclude the prosecutor from questioning [Petitioner] on the [Pouncey] indictment, or advise [Petitioner] that he could testify regarding the [Pouncey] indictment – and invoke his Fifth Amendment rights on the [Keegan] indictment." (Pet'r § 440.10 Aff. ¶ 29; see Pet'r § 440.10 Mem. at 20, 30.)

                    d.   The Trial Court's "Rape Comment"

During voir dire, the trial judge informed "the entire panel of prospective jurors that she was a rape victim herself." (Pet'r § 440.10 Aff. ¶ 29.)  Petitioner "requested Meyer to register an objection and request a different panel of prospective jurors. Meyer declined to do so without explanation." (Id.)  The judge's comment suggested "that the jury would hear from a rape victim, and caused the jury to be very sympathetic towards the Court and Keegan." (Pet'r § 440.10 Mem. at 22.)

                    e.   Orders of Protection

Meyer failed to object to two orders of protection that prohibited Petitioner from contacting Keegan, and which caused "irreparable prejudice to [Petitioner's] defense." (Pet'r § 440.10 Aff. ¶ 11; see id. ¶ 28; Pet'r § 440.10 Mem. at 20-22.)

55

          3.   <u>Trial Claims</u>

              a.   <u>Opening Statement and Summation</u>

Meyer said in his opening statement that Petitioner had engaged in consensual sex with Keegan on the day he allegedly raped her. Petitioner had never told Meyer this, and Petitioner was subsequently impeached when he testified that he did not have sex with Keegan that day. (<u>See</u> Pet'r § 440.10 Aff. ¶¶ 32-33; Pet'r § 440.10 Mem. at 23-24.)

On summation, Meyer continued to argue that Petitioner had consensual sex with Keegan, despite Petitioner's contradictory testimony. (<u>See</u> Pet'r § 440.10 Aff. ¶¶ 35 at A, 38; Pet'r § 440.10 Mem. at 32.) Meyer's summation also highlighted Petitioner's criminal record, and credited Keegan's testimony over his own. (<u>See</u> Pet'r § 440.10 Aff. ¶¶ 38-42, 53; Pet'r § 440.10 Mem. at 32.)

                 b.   <u>Cross-Examination</u>

Meyer failed to cross-examine Keegan about prior inconsistent statements and her willingness to testify. (<u>See</u> Pet'r § 440.10 Aff. ¶¶ 35 at D, K, 51.) Meyer also failed "to examine Keegan as to her psychiatric history," "her propensity to falsely implicate others in crime," and "her uncertainty expressed to Dwyer as to what she owed [Petitioner] money for" (<u>Id.</u> ¶ 35 at E, G, H; <u>see</u> <u>id.</u> ¶¶ 43, 52; Pet'r § 440.10 Mem. at 27-28); as well as "Simpson's . . . manipulation of Keegan into accusing [Petitioner] of assault," and the prosecutor's "manipulation of Keegan into accusing [Petitioner] of sex crimes." (Pet'r § 440.10 Mem. at 27-28.)

Meyer "permitted [Petitioner's] confrontation rights to be

violated . . . when he permitted the Court to preclude him from examining Johnson as to the reason she was testifying." (Id. at 28.)  Had Meyer cross-examined Johnson, he could have established that Officer Kennedy and the prosecutor forced her to testify against Petitioner "against her will and under threat of imprisonment." (Id.)

Meyer also failed to question Detective Lebron about "his five month investigation of the Keegan matter," and about "the inconsistent statements given to him from Keegan regarding the assault location." (Pet'r § 440.10 Aff. ¶ 35 at P, V.)  Meyer's cross-examination of Lebron was overly brief in light of the amount of time he had spent investigating the Keegan case. (See Pet'r § 440.10 Mem. at 28.)

> c.  The Defense's Case

Meyer questioned Petitioner with respect to the Keegan charges without having prepared Petitioner to give such testimony.  These questions "opened the door" for the prosecutor to cross-examine him on the Keegan charges, which led to Petitioner offering several prejudicial statements, such as his opinion that he would have killed Keegan had he assaulted her, and that he was a drug dealer. (Pet'r § 440.10 Aff. ¶¶ 30, 44; Pet'r § 440.10 Mem. at 31.)  Meyer failed "to object to patently objectionable tactics by [the prosecutor] when cross-examining [Petitioner]." (Pet'r § 440.10 Mem. at 32.)

Meyer "failed to call any of the other witnesses to whom Keegan gave inconsistent statements." (Id. at 28.)

d.   Failure to Request Charges

Meyer failed to request a missing witness charge with respect to Simpson, "in that Simpson allegedly witnessed the events that gave rise to the [Keegan] indictment and was on [the prosecutor's] witness list." (Pet'r § 440.10 Aff. ¶ 35 at F; see Pet'r § 440.10 Mem. at 33-34.)

Meyer failed to "request to charge the voluntariness of the statement [Petitioner] allegedly made to Lebron, and no instruction was given as a result." (Pet'r § 440.10 Aff. ¶ 35 at I; see Pet'r § 440.10 Mem. at 36.)

Meyer failed to "request to charge that Keegan and Johnson were interested witnesses when neither desired to testify, and both were forced to testify under threat of government action against them for failing to do so." (Pet'r § 440.10 Aff. ¶ 35 at J; see Pet'r § 440.10 Mem. at 35-36.)

4.   Post-Trial Claims

In June and July 1997, Petitioner submitted complaints about Meyer to the Bar Association of New York and the 18-B Panel, alleging that Meyer had conspired with the prosecutor to secure Petitioner's conviction. (See Pet'r § 440.10 Aff. ¶ 45; Proceeding, dated Sept. 2, 1997 ("Sept. 2 Proceeding"), Tr. vol. 2, at 2-3, 11.)  Meyer informed Petitioner that he would request to be relieved as counsel, and subsequently filed a motion to this effect, which was granted. (See Pet'r § 440.10 Aff. ¶¶ 45-46; Sept. 2 Proceeding at 15.)  Meyer's request was improper, as he was the only attorney capable of adequately representing Petitioner post-

trial by submitting a motion to set aside the verdict. (See Pet'r § 440.10 Aff. ¶¶ 46-47.)    When new counsel, Kevin Canfield ("Canfield"), took over Petitioner's representation, Meyer failed to adequately assist and prepare him, leaving him unable to appropriately represent Petitioner at sentencing and advise him as to grounds for appeal. (See id. ¶¶ 47-49; Pet'r § 440.10 Mem. at 37-39.)

      5.  Meyer's Response to Petitioner's Claims

Meyer submitted an affirmation in response to the § 440.10 Motion, contending that he conducted adequate investigation prior to trial, planned his strategy with Petitioner's participation and understanding, and discussed with Petitioner whether he should testify. (See generally Affidavit of Howard Meyer, Esq., dated July 25, 2002 ("Meyer Aff."), Ex. N to Resp't Decl.)

    C.  Application of the Law to Petitioner's Claims

      1.  Procedurally Barred Claims

In dismissing the § 440.10 Motion, the New York Supreme Court found that several of Petitioner's claims were procedurally barred, as Petitioner could have raised them on direct appeal, but failed to do so. See N.Y. Crim. Proc. Law § 440.10(2)(c) (barring claims raised in a § 440.10 motion where those claims are record-based and the defendant unjustifiably failed to raise them on direct appeal). The court identified the following claims as procedurally barred: (1) Meyer failed to object to the trial court's issuance of orders of protection; (2) Meyer failed to move to dismiss the sexual offense charges; (3) Meyer failed to move to sever the Trial I

indictments on the ground that Petitioner had an important need to testify with respect to the Pouncey charges, but to refrain from testifying with respect to the Keegan charges; (4) Meyer failed to object and move to dismiss the venire when the trial judge disclosed that she was a rape victim; (5) Meyer failed to move in limine for a ruling permitting Petitioner to testify with respect to the Pouncey indictment, but exercise his right to remain silent with respect to the Keegan indictment; (6) all claims pertaining to Meyer's direct examination of Petitioner; (7) all claims pertaining to Meyer's cross-examination of Keegan and Detective Lebron; (8) Meyer's failure to change his strategy to support Petitioner's testimony that he had not had sex with Keegan;[17] (9) all claims pertaining to Meyer's failure to object to the jury charge or request a new jury charge; and (10) all claims pertaining to Meyer's opening statement and summation. (See § 440.10 Decision at 11-14.)

A petitioner's unjustifiable failure to raise a claim on direct appeal serves as an independent and adequate state procedural ground for barring the claim from collateral review, pursuant to New York Criminal Procedure Law § 440.10(2)(c). See Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003). This Court is itself prohibited from considering Petitioner's procedurally barred claims unless Petitioner can demonstrate cause for the

---

[17] The court noted that, "[o]f course, [Petitioner's] claim of ineffectiveness in this regard is belied by the fact that the jury did not convict him of the sex offense charges." (§ 440.10 Decision at 13.)

default as well as prejudice, or that a fundamental miscarriage of justice would result if the court does not consider his claims. <u>See Harris v. Reed</u>, 489 U.S. 255, 262, 109 S. Ct. 1038, 1043 (1989); <u>Sweet</u>, 353 F.3d at 141.    "[T]he cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." <u>McCleskey v. Zant</u>, 499 U.S. 467, 493, 111 S. Ct. 1454, 1470 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 467, 488, 106 S. Ct. 2639, 2645 (1986)); <u>accord</u> <u>Bloomer v. United States</u>, 162 F.3d 187, 191 (2d Cir. 1998).  Where a "petitioner has failed to establish 'cause,' in other words why he did not raise these claims at the appropriate time and in the appropriate forum, it is unnecessary to make an inquiry into the question of 'prejudice.'" <u>Bentley v. Scully</u>, 851 F. Supp. 586, 604 (S.D.N.Y.), <u>vacated on other grounds</u>, 41 F.3d 818 (2d Cir. 1994); <u>accord</u> <u>Engle v. Isaac</u>, 456 U.S. 107, 134 n.43, 102 S. Ct. 1558, 1575 (1982); <u>Richter v. Artuz</u>, 77 F. Supp. 2d 385, 395 (S.D.N.Y. 1998) (Report and Recommendation, adopted on Nov. 18, 1999); <u>Meachem v. Keane</u>, 899 F. Supp. 1130, 1139 (S.D.N.Y. 1995) (Report and Recommendation, adopted on Sept. 13, 1995).

Petitioner contends that he failed to raise these ineffectiveness claims on direct review due to the ineffectiveness of his appellate counsel. (<u>See</u> Pet. at 18.)  Ineffectiveness of appellate counsel may only serve as cause for a procedural default if the appellate counsel claim itself has been exhausted, <u>see Sweet</u>, 353 F.3d at 141 n.7, and has merit. See <u>Larrea v. Bennett</u>,

368 F.3d 179, 183 (2d Cir. 2004). However, as discussed in Section X, infra, Petitioner's appellate counsel was constitutionally effective. Therefore, Petitioner fails to establish cause for his default.

Although an exception to the cause and prejudice requirement may be made if necessary to avoid a fundamental miscarriage of justice, which would require a showing of actual innocence, see Murray, 477 U.S. at 495-96, 106 S. Ct. at 2649, Petitioner's claims do not establish that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Dixon v. Miller, 293 F.3d 74, 81 (2d Cir. 2002) (quoting Murray, 477 U.S. at 496, 106 S. Ct. at 2649). "To establish actual innocence, [a] petitioner must demonstrate that in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Id. (quoting Bousley v. United States, 523 U.S. 614, 623, 118 S. Ct. 1604, 1611 (1998)) (internal quotation marks omitted). As Petitioner offers no new evidence of innocence, this Court cannot find that a miscarriage of justice occurred without "asserting that none of the jurors acted reasonably." Lucidore v. N.Y. State Div. of Parole, No. 99 Civ. 2936 (AJP), 1999 WL 566362, at *8 (S.D.N.Y. Aug. 3, 1999), aff'd, 209 F.3d 107 (2d Cir. 2000); see also Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) ("[Petitioner] presented no new evidence of his innocence and did not make the necessary showing required . . . to bypass the procedural bars."). The testimony of Pouncey and Keegan alone was a sufficient basis for a reasonable jury to convict Petitioner. See

Edwards v. Jones, 720 F.2d 751, 755 (2d Cir. 1983) ("[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.") (quoting United States v. Danzey, 594 F.2d 904, 916 (2d Cir. 1979)).

Because Petitioner cannot demonstrate that a miscarriage of justice will result if his ineffective assistance claims are not heard, this Court has no basis to excuse Petitioner's procedural default, and recommends that his defaulted claims be dismissed.

### 2. Conflict of Interest Claims

The New York Supreme Court found that Petitioner's claims "that counsel expressed the view that he was guilty of the charged crimes, urged him to take a plea, advised him not to take the stand, told [Petitioner] that he would not use his best efforts to represent [him]," and that his relationship with Meyer was acrimonious, did not constitute ineffectiveness, at most establishing "a difficult attorney-client relationship." (§ 440.10 Decision at 14.) The court also found that Petitioner's "disagreement with counsel's professional advice or legal strategies" likewise did not constitute ineffectiveness. These holdings were not unreasonable applications of Strickland.

A criminal defendant is unquestionably entitled to representation by conflict-free counsel. See Eisemann v. Herbert, 401 F.3d 102, 107 (2d Cir. 2005). Prejudice to the defendant is presumed if defense counsel is adversely affected by a conflict of interest. See id. "An attorney has an actual . . . conflict of interest when, during the course of the representation, the

63

attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" <u>Winkler v. Keane</u>, 7 F.3d 304, 307 (2d Cir. 1993) (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 356 n.3, 100 S. Ct. 1708, 1722 (1980) (Marshall, J., concurring in part)); <u>accord</u> <u>Triana v. United States</u>, 205 F.3d 36, 40-41 (2d Cir. 2000); <u>United States v. O'Neill</u>, 118 F.3d 65, 71 (2d Cir. 1997). However, even if Meyer disliked Petitioner, and said that he wanted Petitioner to be convicted (allegations that Petitioner has not supported with any sworn statements), Petitioner fails to establish that Meyer's acrimonious relationship with him adversely affected his performance at trial. Meyer prepared a coherent and effective defense for Petitioner, who was not convicted of the most serious charges he faced. That Petitioner and Meyer failed to get along, or failed to agree on trial strategy, does not establish an actual conflict of interest, especially in light of Meyer's demonstrated efforts to earn acquittals for his client. <u>See</u> <u>United States v. Calabro</u>, 467 F.2d 973, 985-86 (2d Cir. 1972) (quoting American Bar Association Project on Standards for Criminal Justice, which concludes that "a defendant is entitled to make the ultimate decision only in regard to whether to plead guilty, waive a jury, and whether to testify; all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client") (internal quotation marks omitted).

The § 440.10 court also rejected Petitioner's claim that Meyer was unduly influenced by his ownership of stock in private prison

corporations, deeming it "outlandish . . . , refuted by the People, and wholly unsubstantiated in the record." (§ 440.10 Decision at 17) (citation omitted).  Petitioner has presented no competent evidence of his attorney's stock ownership and no basis to conclude that the state court's determination was unreasonable.

The § 440.10 court did not explicitly address Petitioner's claims that Meyer was friends with the prosecutor, and sat at the prosecutor's table during trial.  However, the record is devoid of any indication of this alleged friendship, any adverse effect that the friendship (if it existed) had on Petitioner's representation, or any indication that Meyer sat with the prosecutor (behavior that the trial court would surely have perceived and commented on).  Therefore, the court did not unreasonably apply <u>Strickland</u> when it summarily denied these claims. (<u>See</u> <u>id.</u> at 19.)

For these reasons, this Court recommends that Petitioner's conflict of interest claims be dismissed.

### 3.   <u>Inadequate Investigation Claims</u>

The New York Supreme Court found that Petitioner's "claims that counsel failed to investigate the case, failed to investigate impeachment evidence with respect to [Keegan] and Nina Johnson, and failed to interview [Simpson] fail to denote what evidence such investigation would have uncovered and how that information would have aided the defense." (<u>Id.</u> at 17.)  The court also noted that Petitioner's conclusory allegations were unsupported by any sworn statements. (<u>See</u> <u>id.</u>)  Petitioner has not provided any competent evidence to this Court to support his claims, and this Court agrees

that these claims should be rejected.

A petitioner cannot successfully raise an ineffective assistance of trial counsel claim by making conclusory and unsubstantiated contentions that counsel failed to investigate potentially exculpatory leads. See Greiner v. Wells, -- F.3d --, 2005 WL 1864070, at *13 (2d Cir. Aug. 8, 2005) ("[A]s a general matter, when there is 'reason to believe that pursuing investigations would be fruitless . . . , counsel's failure to pursue those investigations may not later be challenged as unreasonable.'") (quoting Strickland, 466 U.S. at 691, 104 S. Ct. at 2067); Curry v. Burge, No. 03 Civ. 0901 (LAK) (AJP), 2004 WL 2601681, at *31 (S.D.N.Y. Nov. 14, 2004) (Report & Recommendation, adopted on Jan. 26, 2005) (dismissing claims of failure to investigate for being conclusory since "there is also no way to know that trial counsel did not consider investigating these claims but simply rejected them as being unpromising"); Lamberti v. United States, 95 Civ. 1557 (PNL), 1998 WL 118172, at *2 (S.D.N.Y. Mar. 13, 1998) ("The allegations of failure to investigate or to communicate are vague and conclusory. They do not identify counsel's asserted failings with any specificity or show how any different conduct might have changed the result."); Vasquez v. United States, 96 Civ. 2104 (PKL), 1997 WL 148812, at *2 (S.D.N.Y. Mar. 28, 1997) (dismissing petitioner's claims where allegations with regard to alleged counsel errors in investigation and trial advocacy are "vague, conclusory, and unsupported by citation to the record, any affidavit, or any other source"); United States v.

<u>Vargas</u>, 871 F. Supp. 623, 624 (S.D.N.Y. 1994) (rejecting ineffective assistance claim based on failure to investigate, since "there is no evidence that avenues suggested by the client which might have altered the outcome were ignored").

Petitioner fails to provide more than unsworn, conclusory assertions that additional investigation would have strengthened the defense's case, and a similarly unsubstantiated contention that Meyer limited Dwyer's investigatory role out of a desire to shield him from prosecutorial scrutiny. He does not explain the basis for his contention that Simpson possessed information favorable to the defense. In addition, his conclusory contention that Meyer could have uncovered damaging information about Johnson's psychological record, not only fails to demonstrate that such evidence existed, but, even if it had, fails to indicate how such evidence would have affected the outcome of Petitioner's trial. Johnson testified that she was in the midst of a crack cocaine binge when she watched Petitioner strike Keegan. As Meyer made the jury well aware, Johnson was a cocaine addict who was high on cocaine and alcohol at the time of the assault. (<u>See</u> Tr. A at 231; Tr. B at 484.) It is unlikely that additional information about her mental state would have influenced the jury.

Furthermore, Meyer's explanation of his approach to the investigatory work in the Keegan case is credible and consistent. Meyer contends that he performed all of the investigation reasonably required under the circumstances. He did not subpoena Simpson because Petitioner gave him no reason to do so. (<u>See</u> Meyer

Aff. ¶ 4(b).)  Furthermore, he had no reason to call Dwyer as a witness, or attempt to get the tape of Dwyer's conversation with Keegan admitted into evidence, because Meyer learned from the Dwyer interview that Keegan would testify that Petitioner had not raped her. (See id. ¶ 4(a).)  Meyer also contends that he did not subpoena Keegan's psychiatric records, or attempt to have Keegan examined, because he believed, based on his experience, that such applications would have been denied; they also would have been unnecessary, due to Keegan's belief that she had not been raped. (See id. ¶ 4(c).)  In light of Keegan's concessions on the most serious charges pertaining to her, it was a reasonable strategic decision to forego challenging her mental state (thus making the jury more likely to believe her testimony that Petitioner had not raped her).  Accordingly, the New York Supreme Court did not unreasonably apply Strickland in finding that Meyer's investigative efforts were adequate, and these claims should be dismissed.

    4.  Inadequate Preparation to Testify Claims

    The New York Supreme Court rejected Petitioner's contentions that Meyer failed to adequately prepare him to testify at trial, and failed to inform him that he could testify with respect to the Pouncey indictment but refrain from testifying with respect to the Keegan indictment. (See § 440.10 Decision at 15, 18.)  The court observed that Petitioner testified against Meyer's advice, and failed "to identify how such preparation would have changed his testimony." (Id. at 15; see Meyer Aff. ¶ 6.)  The court also noted that Meyer advised Petitioner that he could testify with respect to

the Pouncey indictment but remain silent with respect to the Keegan indictment, but cautioned Petitioner that it would be preferable not to take the stand at all, as remaining silent on the Keegan indictment alone would likely damage his credibility in the eyes of the jury. (See § 440.10 Decision at 18; Meyer Aff. ¶ 6.)  The court concluded that Petitioner's claims were baseless.  This Court agrees.

As the trial court observed after the trial, Petitioner's decision to testify was a poor strategic choice. (See Sept. 2 Proceeding at 17.)  However, as the court also noted, this decision was Petitioner's own to make. (See id.)  Petitioner admits that Meyer counseled him against testifying (see Pet'r § 440.10 Aff. ¶ 38), and Meyer adds that Petitioner only decided to testify after the prosecution rested its case. (See Meyer Aff. ¶ 6.)

Most importantly, Petitioner does not suggest how additional preparation would have benefitted him.  Meyer's questions concerning Keegan on direct examination were simple and straightforward, establishing that Keegan was frequently disoriented from drug use, that Petitioner had never hit her, and that Keegan had never appeared beaten or bruised when she engaged in sex with Petitioner. (See Tr. B at 367-69.)  It was Petitioner's decision, unprompted by Meyer, to add that he would have killed Keegan if he had assaulted her as she alleged (see id. at 368), a statement that the prosecutor seized upon during cross-examination. Petitioner cannot blame Meyer for his own harmful testimony, as Meyer did nothing to encourage or solicit it.  Similarly,

Petitioner cannot blame Meyer for the fact that Petitioner's taking the stand permitted the prosecutor to cross-examine him about his drug dealing, as the only way Petitioner could have avoided such questioning would have been to decline to take the stand altogether.

Finally, although Petitioner's testimony was not particularly helpful to his defense, there is no basis to conclude that had he been better or prepared or not testified at all, the outcome of his trial would have been different.

For these reasons, this Court finds that Petitioner's inadequate preparation claims should be dismissed.

5.    <u>Failure to Employ a Reasonable Defense Strategy Claim</u>

The New York Supreme Court found that Meyer

> employed a discernible and coherent strategy in defending the case, and that his representation of [Petitioner] at trial was consistent with that strategy. Indeed, [Petitioner's] persistent complaints that counsel pursued a strategy of denying the assault but admitting consensual sex with [Keegan] are, in themselves, admissions that counsel presented a coherent strategy.

(§ 440.10 Decision at 18-19) (citations omitted). This Court finds the Supreme Court's holding wholly accurate.

According to Meyer, Petitioner knew prior to trial that his defense would be that "Ms. Keegan consented to the sexual contact, and that [Petitioner] did not assault or attempt to assault Ms. Keegan." (Meyer Aff. ¶ 7.) This strategy was eminently reasonable under the circumstances, especially in light of Keegan's testimony that she engaged in consensual sex with Petitioner on the day of the assault. Meyer simply argued that the jury should believe

Keegan's testimony about her sexual contact with Petitioner, but not her testimony about Petitioner hitting her and holding her face to the stove flame. Petitioner cannot establish that this strategy constituted an inadequate defense.

Petitioner's contention that Meyer was ineffective for failing to adapt his strategy to conform with Petitioner's testimony that he had no sexual contact with Keegan on October 22, 1996, is similarly meritless. As an initial matter, Petitioner was aware of Meyer's opening statement, yet he chose to take the stand and contradict it. Once Petitioner testified that Meyer's opening statement was incorrect, Meyer was left in the difficult position of having to alter his own argument, or continue to contradict Petitioner's testimony. Either choice would have carried its own advantages and drawbacks for the defense's case. In arguing on summation that Petitioner and Keegan engaged in consensual sex, Meyer reminded the jury that Keegan did not consider herself to have been the victim of a crime. This was profoundly exculpatory evidence, and Meyer's decision to reiterate it, at the possible expense of Petitioner's credibility, was a reasonable decision.

In any event, Petitioner cannot establish that prejudice resulted from Meyer's choice of strategy. Thanks to Meyer's defense, Petitioner avoided convictions on the most serious charges in both the Pouncey and Keegan cases. Based on these results, there is no basis for Petitioner to contend that he was deprived of effective assistance.

For these reasons, the Court recommends that this claim be

dismissed.

<u>                6.   Meyer's Motion to Be Relieved as Counsel</u>

The New York Supreme Court rejected Petitioner's claim that Meyer improperly sought to be relieved and failed to adequately prepare his successor, noting that Petitioner "failed to set forth any factual allegations specifying how the change in counsel prejudiced him." (§ 440.10 Decision at 16.)  This Court agrees.

Petitioner cannot realistically claim that Meyer was involved in a conspiracy with the prosecutor to secure his conviction, but was also the best attorney available to represent him post-trial. Furthermore, once Petitioner submitted formal grievances accusing Meyer of significant misconduct, he could not expect Meyer to continue to represent him to the best of his ability.  In short, Petitioner's claim that Meyer should not have attempted to terminate representation is clearly meritless.

In addition, as the § 440.10 court found, Petitioner makes no showing whatsoever that he was prejudiced by Meyer's efforts, or lack thereof, in turning over his trial materials to Canfield. With respect to Trial I, Canfield only represented Petitioner for sentencing and post-trial motions, and Petitioner does not indicate how these proceedings would have been resolved differently had Meyer continued to represent him.[18]  Furthermore, as the Court will discuss below, Petitioner received constitutionally effective

---

[18] Canfield also represented Petitioner in Trial II. Petitioner does not contend that Canfield's representation was constitutionally ineffective.

appellate counsel.

For these reasons, the Court finds that the § 440.10 court did not err in its adjudication on the merits. Petitioner was not deprived of effective trial counsel.

X.    <u>Ineffective Assistance of Appellate Counsel Claims</u>

Petitioner contends that his appellate counsel was ineffective for failing to raise on direct appeal the numerous ineffective assistance of trial counsel claims that the § 440.10 court rejected as procedurally barred. (<u>See</u> Pet. at 18; Coram Nobis Pet. at 33-56.)[19] Respondent replies that Petitioner's claims are meritless. (<u>See</u> Resp't Mem. at 79-88.)  The Court agrees.

A.    <u>Standard of Review</u>

Claims of ineffective assistance of appellate counsel are evaluated under the two-part test of <u>Strickland</u>. <u>See</u> <u>Aparicio</u>, 269 F.3d at 95. In the appellate context, it is not enough for a petitioner to argue simply that counsel did not raise certain nonfrivolous arguments on appeal, as no duty to raise every such argument exists. <u>See</u> <u>Evitts v. Lucey</u>, 469 U.S. 387, 394, 105 S. Ct. 830, 835 (1985); <u>Aparicio</u>, 269 F.3d at 95; <u>see also</u> <u>Jones v. Barnes</u>, 463 U.S. 745, 754, 103 S. Ct. 3308, 3314 (1983) (noting that where an attorney exercises reasonable professional judgment in selecting the most promising issues to raise on appeal, a reviewing court should not second-guess that judgment); <u>Sellan</u>, 261

---

[19] Petitioner also contends that his appellate counsel was ineffective for failing to raise a claim that Meyer was adversely affected by a conflict of interest. (<u>See</u> Pet. at 18; Coram Nobis Pet. at 17-33.)  As discussed, this claim is meritless.

F.3d at 317 ("[The] process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.") (quoting Smith v. Murray, 477 U.S. 527, 536, 106 S. Ct. 2661, 2667 (1986)) (internal quotation marks omitted).  Thus, a petitioner must show that appellate counsel selected grounds for appeal unreasonably, such as by "omitt[ing] significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark, 214 F.3d at 322 (quoting Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994)); cf. Hemstreet v. Greiner, 367 F.3d 135, 141-42 (2d Cir.) (finding that appellate counsel failed the first Strickland prong when he did not "pursue[] any remedy for the intimidation of a crucial witness" which "clearly stood out in the trial record," and where failure to appeal constituted "a severe mistake in judgment"), vacated on other grounds, 378 F.3d 265 (2d Cir. 2004).  "To establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his claim would have been successful" before the state's highest court. Hemstreet, 367 F.3d at 142 (quoting Mayo, 13 F.3d at 534).

    B.    Application of the Law to Petitioner's Claims

        The Court notes that appellate counsel submitted a cogently written, thirty-four page brief to the Appellate Division, which raised three claims: (1) the trial court improperly joined the Pouncey and Keegan indictments; (2) the court improperly limited its read-back of Pouncey's testimony; and (3) the court improperly

limited Meyer's cross-examination of Detective Lebron. Petitioner does not contend that appellate counsel erred in raising these claims. In fact, counsel's choice to appeal joinder of the indictments was particularly competent, as Petitioner had repeatedly challenged joinder, see supra at 25 n.7, and the court noted during trial that joinder "raise[d] some very interesting questions" to be considered on appeal. (Tr. B at 342.) Counsel's decision to focus his appeal on these grounds was not a mistake in judgment of a degree that would warrant habeas relief.

Furthermore, Petitioner's contention that appellate counsel should have raised the myriad ineffective assistance of trial counsel claims that he lists in his Coram Nobis Petition is clearly meritless. No competent appellate counsel would bring so many claims on appeal. See Sellan, 261 F.3d at 317. Furthermore, Petitioner does not identify any particular claim that would have likely met with success on direct review. As discussed, Meyer's representation of Petitioner was competent and effective; any mistakes he may have made were grounded in decisions of trial strategy, and were thus unlikely to succeed. See Eze, 321 F.3d at 132.[20]

Petitioner fails to alert the Court to any "significant and obvious issues" that would have been stronger than those actually raised on appeal, Clark, 214 F.3d at 322, and cannot establish that

---

[20] The Court additionally notes that the trial court went to great lengths to praise the quality of Meyer's performance (see Sept. 2 Proceeding at 4-7, 13-15, 17), going as far as to call it "masterful." (Id. at 13.)

the Appellate Division unreasonably applied <u>Strickland</u> in denying his coram nobis petition.

XI. <u>Trial II Claims</u>

Petitioner raises two claims pertaining to Trial II. Specifically, he contends that the trial court improperly restricted defense counsel's summation, and wrongfully excluded Petitioner from a sidebar conference during voir dire. (<u>See</u> Pet. at 14-16.) As Respondent contends, Petitioner's claims are time-barred under AEDPA. (<u>See</u> Resp't Mem. at 61-63.)

AEDPA requires that petitions for writs of habeas corpus challenging state court convictions be filed within a one-year statute of limitations. <u>See</u> 28 U.S.C. § 2244(d)(1). The one-year period generally runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." <u>Id.</u>; <u>accord</u> <u>Acosta v. Artuz</u>, 221 F.3d 117, 119 (2d Cir. 2000); <u>Geraci v. Senkowski</u>, 211 F.3d 6, 8 (2d Cir. 2000). In New York, a judgment of conviction becomes final for these purposes ninety days after the date on which the Court of Appeals denies leave to appeal – that is, at the conclusion of the period during which a petitioner could have sought certiorari in the United States Supreme Court, and has failed to do so. <u>See</u> <u>Valverde v. Stinson</u>, 244 F.3d 129, 132 (2d Cir. 2000); <u>Acosta</u>, 221 F.3d at 120; <u>Ross v. Artuz</u>, 150 F.3d 97, 98 (2d Cir. 1998).

Petitioner's conviction became final on April 23, 2002, ninety days after the Court of Appeals denied Petitioner leave to appeal.

Thus, the one-year statute of limitations expired on April 23, 2003. Petitioner filed the Petition on April 19, 2004, almost one year after the limitations period had expired. While the pendency of a properly filed application for state post-conviction relief may toll the limitations period, see Acosta, 221 F.3d at 119, Petitioner did not file any post-conviction motions with respect to Trial II subsequent to the determination of his direct appeal. Therefore, unless Petitioner can demonstrate that he is entitled to equitable tolling of the limitations period, Petitioner's Trial II claims are time-barred. See Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curiam) (noting that equitable tolling is only available in "rare and exceptional circumstances").

Petitioner contends that he is entitled to equitable tolling because he was prepared to timely file a petition raising his Trial II claims, but, based on his interpretation of the instructions included in his federal habeas corpus petition package, which was provided by this Court's Pro Se Office, he believed he could not do so until he first exhausted his Trial I claims in state court. (See Pet'r Reply Mem. at 28.) The instructions Petitioner quotes, however, in no way support this conclusion. (See id.) Moreover, a petitioner's unfamiliarity with the law does not excuse him from complying with AEDPA's statute of limitations. See Turner v. Johnson, 177 F.3d 390, 392 (5th Cir. 1999); Francis v. Miller, 198 F. Supp. 2d 232, 235 (E.D.N.Y. 2002); Cannon v. Kuhlmann, No. 99 Civ. 10101 (DLC), 2000 WL 1277331, at **1-2 (S.D.N.Y. Sept. 7, 2000); Zorilla v. Artuz, No. 99 Civ. 9249 (NRB), 2000 WL 328881, at

77

*1 (S.D.N.Y. Mar. 29, 2000); see also Nash v. McGinnis, No. 04 Civ. 9496 (KMK), 2005 WL 1719871, at *3 (S.D.N.Y. July 22, 2005) ("It is also well-established that lack of education and even illiteracy by themselves do not justify equitable tolling."). Petitioner's failure to timely raise his Trial II claims stems entirely from his misunderstanding of federal law. Thus, he is not entitled to equitable tolling, and his claims should be dismissed as time-barred.

## CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the Petition be dismissed with prejudice. Further, because Petitioner has not made a substantial showing of a denial of a federal right, the Court recommends that no certificate of appealability be issued. See 28 U.S.C. § 2253(c)(2); Lucidore, 209 F.3d at 112. The Court further recommends certification, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from the Court's order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 445-46, 82 S. Ct. 917, 921 (1962).

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this report to file written objections. See also Fed. R. Civ. P. 6(a), (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Kenneth M. Karas, United States District Judge, and to the chambers of the undersigned, Room 1660. Any requests for an extension of time for filing objections must be

directed to Judge Karas.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140, 155, 106 S. Ct. 466, 475 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).


                                    Respectfully Submitted,


                                    _____
                                    THEODORE H. KATZ
                                    UNITED STATES MAGISTRATE JUDGE

Dated:   August 19, 2005
         New York, New York

Copies sent to:

Isaiah Brown
97-A-7589
Otisville Correctional Facility
P.O. Box 8
Otisville, New York 10963

Alyson J. Gill, Esq.
Assistant Attorney General
120 Broadway
New York, New York 10271